UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

RICHARD J. McCORD, as Chapter 7 Trustee of the
Estate of AMEER MOHAMEAD HANIFF a/k/a
AMEER HANIFF, a/k/a AMEER MOHAMMED
HANIFF, a/k/a ANEER HANIFF,

               Plaintiff,

          v.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

               Defendant.

**MEMORANDUM & ORDER**
23-CV-5262 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.    Background ............................................................................................................... 5

   a.   The insurance policy ....................................................................................... 5

   b.   The accident and Umana's no-fault benefits application .................................... 7

   c.   The commencement of the state proceeding ..................................................... 10

   d.   The entry of default in the state proceeding ..................................................... 14

   e.   The state court's entry of judgment and subsequent events ............................... 17

   f.   The bankruptcy proceeding ............................................................................. 19

   g.   The instant action .......................................................................................... 20

II.   Discussion .............................................................................................................. 20

   a.   Standard of review ......................................................................................... 20

      i.   Rule 56 – Summary Judgment ..................................................................... 20

      ii.   Rule 702 – Motion to strike expert report and preclude expert testimony ................... 22

      iii.   Rules 6, 38, and 39 – Motion for leave to file Jury Demand and motion to strike Jury Demand ....................................................................................................... 26

   b.   The Court grants in part and denies in part Plaintiff Trustee's motion for summary judgment and denies Defendant's cross-motion for summary judgment in its entirety ........... 29

      i.   Defendant breached its contractual duty to defend ..................................................... 29

         1.   Defendant breached its duty to defend the Policyholder in the Umana Lawsuit ...... 32

      ii.   Defendant has not established any defense to excuse its breach of its duty to defend 36

1.     Waiver of false reporting defense ........................................................... 36

2.     Defendant was not prejudiced by the Insured's failure to comply with the Policy's notice provision........................................................................................ 38

3.     Defendant has failed to establish a non-cooperation defense ................................. 42

iii.    Plaintiff Trustee may recover the full default judgment of the Umana Lawsuit as consequential damages but there exists a genuine dispute of material fact that precludes a finding that Defendant breached its duty to defend in bad faith........................................ 44

1.     Alleged causation requirements .............................................................. 44

2.     Consequential damages in excess of the Policy's limits........................... 48

3.     Bad Faith.................................................................................................. 55

c.    The Court strikes portions of Passin's expert report and precludes his testimony on various specific issues ........................................................................................................ 65

i.    Passin's opinions about Defendant's intent, motives, and state of mind .................... 67

ii.    Other objections ..................................................................................... 71

d.    The Court grants Plaintiff Trustee's request to deem the Jury Demand filed *nunc pro tunc* and denies Defendant's motion to strike the Jury Demand ..................................................... 74

i.    The impact of the procedural posture........................................................... 76

ii.    *Higgins* Factors under Rule 39(b) ............................................................. 81

III.    Conclusion ....................................................................................................... 84

On October 31, 2019, Ameer Mohamead Haniff, also known as Ameer Haniff, Ameer Mohammed Haniff, and Aneer Haniff, filed for bankruptcy protection under Chapter 7 of Title 11 of the United States Code in the Eastern District of New York Bankruptcy Court (the "Bankruptcy Court") and Richard J. McCord was appointed as Chapter 7 Trustee of Haniff's estate (the "Plaintiff Trustee"). *See In re Haniff*, No. 19-BJ-46590 (Bankr. E.D.N.Y. Oct. 31, 2019). On October 13, 2022, Plaintiff Trustee filed a complaint against Defendant Government Employees Insurance Company ("GEICO") in the Bankruptcy Court (the "Adversary Proceeding"), alleging breach of contract and bad faith. (Compl., annexed to Decl. of Frank Misiti as Ex. A, Docket Entry No. 21-1.) *See McCord v. Gov't Emps. Ins. Co.*, No. 22-AP-1081 (Bankr. E.D.N.Y. Oct. 13, 2022). On November 29, 2022, Defendant moved the Court to withdraw the reference of the Adversary Proceeding from the Bankruptcy Court, which Plaintiff

Trustee opposed.  (*See* Def.'s Mot. to Withdraw (the "Motion to Withdraw Bankruptcy Reference"), Docket Entry No. 1; Pl.'s Opp'n to Def.'s Motion to Withdraw Bankruptcy Reference, Docket Entry No. 5.)  By Memorandum and Order dated June 27, 2023, the Court granted Defendant's Motion to Withdraw Bankruptcy Reference.[1]  (Mem. and Order dated June 27, 2023 (the "Bankruptcy Reference Withdrawal Decision"), Docket Entry No. 10.)

On July 31, 2025, Plaintiff Trustee moved for judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Defendant opposed the motion.[2]  That same day, Defendant cross-moved for judgment as a matter of law pursuant to Rule 56, and Plaintiff

---

[1]  District courts have original jurisdiction but not exclusive jurisdiction over civil proceedings "arising under," "arising in," or "related to" cases under Title 11 of the United States Code.  28 U.S.C. § 1334(b).  "Each district court may provide that any or all cases under [T]itle 11 and any or all proceedings arising under [T]itle 11 or arising in or related to a case under [T]itle 11 shall be referred to the bankruptcy judges for the district."  28 U.S.C. § 157(a).  The Eastern District of New York has a standing order that automatically refers bankruptcy cases to bankruptcy judges.  *In re Referral of Matters to Bankr. Judges* (E.D.N.Y. Dec. 5, 2012); *see Thaler v. Parker*, 525 B.R. 582, 584 (E.D.N.Y. 2014).  However, "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d).  The moving party bears the burden of demonstrating "cause."  *Thaler*, 525 B.R. at 585; *see also 29 Beekman Corp. v. Wansdown Props. Corp. N.V.*, No. 20-CV-2280, 2021 WL 4481006, at *6 (S.D.N.Y. Sep. 29, 2021).
The Court found Defendant demonstrated cause to withdraw the reference and thus retained jurisdiction over the Adversary Proceeding.  (Bankruptcy Reference Withdrawal Decision 8–17.)

[2]  (Notice of Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), Docket Entry No. 87; Decl. of Robert Kaminski, Esq. in Supp. of Pl.'s Mot. ("Kaminski Decl."), appended to Pl.'s Mot., Docket Entry No. 87-1; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), appended to Pl.'s Mot., Docket Entry No. 87-28; Def.'s Mem. in Opp'n to Pl.'s Mot. ("Def.'s Opp'n"), Docket Entry No. 88; Pl.'s Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply"), Docket Entry No. 90; Decl. of Robert Kaminski, Esq. in Supp. of Pl.'s Reply to Pl.'s Mot. ("Kaminski Reply Decl."), Docket Entry No. 91.)

Trustee opposed the motion.[3]  In addition, (1) on September 30, 2025, Defendant moved to strike the report of Howard Passin and his anticipated expert testimony, and Plaintiff Trustee opposed the motion;[4] (2) on October 17, 2025, Defendant moved to strike Plaintiff Trustee's jury demand (filed with the Court on September 14, 2023 (Demand for Trial by Jury (the "Jury Demand"), Docket Entry No. 15), which Plaintiff Trustee opposed; and (3) Plaintiff Trustee cross-moved for leave to serve a demand for trial by jury or for the Court to deem the Jury Demand filed *nunc pro tunc*, which Defendant opposed.[5]

---

[3]  (Notice of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mot."), Docket Entry No. 93; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 94; Decl. of Ronald Lepinskas, Esq. in Supp. of Def.'s Mot. ("Lepinskas Decl."), Docket Entry No. 96; Decl. of Amber Sparks in Supp. of Def.'s Mot. ("Sparks Decl."), Docket Entry No. 97; Decl. of Rushikesh Patel in Supp. of Def.'s Mot. ("Patel Decl."), Docket Entry No. 98; Decl. of Trey Ragan in Supp. of Def.'s Mot. ("Ragan Decl."), Docket Entry No. 99; Decl. of Philip Mallor in Supp. of Def.'s Mot. ("Mallor Decl."), Docket Entry No. 100; Pl.'s Mem. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), Docket Entry No. 101; Decl. of Robert Kaminski, Esq. in Opp'n to Def.'s Mot. ("Kaminski Opp'n Decl."), Docket Entry No. 103; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 104.)

[4]  (Notice of Def.'s Mot. to Strike ("Def.'s Mot. to Strike"), Docket Entry No. 114; Def.'s Mem. in Supp. of Def.'s Mot. to Strike ("Def.'s Strike Mem."), Docket Entry No. 115; Decl. of Ronald Lepinskas, Esq. in Supp. of Def.'s Mot. to Strike ("Lepinskas Strike Decl."), Docket Entry No. 116; Pl.'s Opp'n to Def.'s Mot. to Strike ("Pl.'s Strike Opp'n"), Docket Entry No. 117; Def.'s Reply in Supp. of Def.'s Mot. to Strike ("Def.'s Strike Reply"), Docket Entry No. 118.)

[5]  (Notice of Def.'s Motion to Strike Jury Demand ("Def.'s Mot. to Strike Jury Demand"), Docket Entry No. 121; Def.'s Mem. in Supp. of Def.'s Mot. to Strike Jury Demand ("Def.'s Jury Demand Mem."), Docket Entry No. 122; Notice of Pl.'s Cross-Motion for Leave to File Jury Demand ("Pl.'s Mot. for Jury Demand"), Docket Entry No. 124; Pl.'s Mem. in Opp'n to Def.'s Mot. to Strike Jury Demand and in Supp. of Pl.'s Mot. for Jury Demand ("Pl.'s Jury Demand Mem."), Docket Entry No. 125; Decl. of Ronald Lepinskas, Esq. in Supp. of Pl.'s Mot. for Jury Demand ("Lepinskas Jury Demand Decl."), Docket Entry No. 126; Def.'s Mem. in Opp'n to Pl.'s Mot. for Jury Demand and in Reply in Supp. of Def.'s Mot. to Strike Jury Demand ("Def.'s Jury Demand Reply Mem."), Docket Entry No. 127; Pl.'s Reply in Supp. of Pl.'s Mot. for Jury Demand ("Pl.'s Jury Demand Reply Mem."), Docket Entry No. 128.)

For the reasons explained below, the Court (1) grants in part and denies in part Plaintiff Trustee's motion for summary judgment, (2) denies Defendant's motion for summary judgment, (3) grants in part and denies in part Defendant's motion to strike the report of Howard Passin, (4) grants Plaintiff Trustee's motion for the Jury Demand to be deemed filed *nunc pro tunc*, and (5) denies Defendant's motion to strike the Jury Demand.

## I.   Background

The following facts are undisputed unless otherwise noted.[6]

### a.   The insurance policy

Defendant issued a policy to Haniff and other insureds[7] providing "for liability coverage and defense of claims arising out of the negligent ownership and/or operation of" covered vehicles for a policy period of June 9, 2016 through December 9, 2016 (the "Policy").  (Policy, annexed to Kaminski Decl. as Ex. C, Docket Entry No. 87-4; Policy, annexed to Lepinskas Decl. as Ex. A, Docket Entry No. 96-1; *see also* Def.'s 56.1 Resp. ¶¶ 3, 8.)  Section I of the Policy states:

> **LOSSES WE WILL PAY FOR YOU**
> Under Section I, we will pay damages which an insured becomes legally obligated to pay because of:
> 1. bodily injury sustained by a person; and
> 2. property damage
> arising out of the ownership, maintenance or use (including loading or unloading) of the

---

[6] (Pl.'s 56.1 Stmt. ("Pl.'s 56.1"), appended to Pl.'s Mot., Docket Entry No. 87-29; Def.'s Opp'n to Pl.'s 56.1 ("Def.'s 56.1 Resp."), Docket Entry No. 89; Pl.'s Reply in Supp. of Pl.'s 56.1 ("Pl.'s 56.1 Reply"), Docket Entry No. 92; Def.'s 56.1 Stmt. ("Def.'s 56.1"), Docket Entry No. 95; Pl.'s Opp'n to Def.'s 56.1 ("Pl.'s 56.1 Resp."), Docket Entry No. 102; Def.'s Reply in Supp. of Def.'s 56.1 ("Def.'s 56.1 Reply"), Docket Entry No. 105.)

[7] The automobile policy was issued by Defendant to Shanta Haniff and her spouse, Aftabadeen Haniff, and covered their son, Ameer Haniff.  (Pl.'s 56.1 Resp. ¶¶ 1–2.)  Defendant communicated with both insureds, Shanta and Aftabadeen Haniff, and their son, Ameer Haniff, throughout the course of its investigation and the record submitted is often not clear as to which insured the Defendant spoke with.  As such, and unless otherwise indicated, the Court refers to all three collectively as the "Insured" or the "Policyholder."

owned auto or a non-owned auto.  We will defend any suit for damages payable under the terms of this policy even if the claim or suit is groundless.  We may investigate and settle any claim or suit.

(Policy 4 (emphasis omitted); *see also* Def.'s 56.1 Resp. ¶ 9.)  In addition, Section I of the Policy states:

> **ADDITIONAL PAYMENTS WE WILL MAKE UNDER THE LIABILITY COVERAGES**
> 1. All investigative and local costs incurred by us.
> 2. All court costs charges to an insured in a covered law suit.
> 3. All interest accruing after the entry of a judgment on the amount of that judgment which is within our limit of liability, until we have paid, offered, or deposited in court that part of a judgment not exceeding the limit of our liability.

(Policy 5 (emphasis omitted).)  Further, Section I of the Policy lists specific conditions that apply to parties' obligations under the Policy:

> **CONDITIONS**
> The following conditions apply to Section I:
> 1. NOTICE
> As soon as possible after an occurrence, written notice must be given us or our authorized agent stating:
>> the identity of the insured;
>> the time, place and details of the occurrence;
>> the names and addresses of the injured, and of any witnesses; and
>> the names of the owners and the description and location of any damaged property.
> If a claim or suit is brought against an insured, he must promptly send us each demand, notice, summons or other process received . . . .
> 3. ASSISTANCE AND COOPERATION OF THE INSURED
> The insured will cooperate and assist us, if requested:
>> in the investigation of the occurrence; and
>> in making settlements; and
>> in the conduct of suits; and
>> in enforcing any right of contribution or indemnity against any legally or responsible person or organization because of bodily injury or property damage; and
>> at trials and hearings; and
>> in securing and giving evidence; and
>> by obtaining the attendance of witnesses.
> Only at his own cost will the insured make a payment, assume any obligation or incur any cost other than for first aid to others.
> 4. ACTION AGAINST US
> No suit will lie against us:

6

> unless the insured has fully complied with all the policy's terms and conditions, and until the amount of the insured's obligation to pay has been finally determined, either:
>
> > (i) by a final judgment against the insured after actual trial; or
> > (ii) by written agreement of the insured, the claimant and us.
>
> A person or organization or the legal representative of either, who secures a judgment or written agreement, may then sue to recover up to the policy limits.
>
> No person or organization, including the insured, has a right under this policy to make us a defendant in an action to determine the insured's liability.
>
> Bankruptcy or insolvency of the insured or his estate will not relieve us of our obligations.

(Policy 7 (emphasis omitted).)  The Policy has a bodily injury liability limit of $25,000 for each person.  (Pl.'s 56.1 Resp. ¶ 3; Policy 24; *see also* Policy 6 ("[T]he limit of Bodily Injury Liability stated in the Declarations as applicable to 'each person' is the limit of our liability for all damages, including damages for care and loss of services, because of bodily injury sustained by one person as a result of one occurrence.").)

### b.    The accident and Umana's no-fault benefits application

On June 26, 2016, while operating an automobile, Haniff struck Mario Umana, a pedestrian (the "Accident").  (Pl.'s 56.1 Resp. ¶ 5; Def.'s 56.1 Resp. ¶ 13.)  The Accident occurred at 131-09 Jamaica Avenue, Richmond Hill, Queens, New York.  (Def.'s 56.1 Resp. ¶ 14.)  As a result of the Accident, Umana lost his leg and suffered other injuries, and Umana's spouse suffered the loss of his services.  (*Id.* ¶¶ 15, 39.)  At the time of the Accident, Haniff's vehicle was insured by Defendant.  (*Id.* ¶ 16; Policy 24.)

On the same day, Shanta Haniff reported physical damage to the Insured's car to Defendant initiating the creation of a claims activity log, referred to as the "A log" (the "A Log"), which consists of a "running record of notes and activities placed in the file by those

7

involved with a claim at any level."[8]  Through a phone call on July 1, 2016 and the submission of a no-fault benefits application on July 16, 2016, Umana's attorney, Kevin Mosely, informed Defendant of the date, time, and location of the Accident, the name of the Insured, and the name, address, and injuries of the injured party, Umana.  (A Log at GE 2010; Def.'s 56.1 Resp. ¶¶ 19,

---

[8]  (A Log at GE 2014–16, annexed to Ragan Decl. as Ex. A, Docket Entry No. 99-1; A Log at GE 2014–16, annexed to Kaminski Decl. as Ex. D., Docket Entry No. 87-5; A Log at GE 2014-16, annexed to Kaminski Opp'n Decl. as Ex. F, Docket Entry No. 103-6; Def.'s 56.1 Resp. ¶¶ 22–24; Pl.'s 56.1 Resp. ¶ 17.)

The A Log entries from GE 1625 through 2016 are submitted in full as Ex. A to the Ragan Decl.  The A Log also consists of other documents, including various letters relating to the Accident and resulting claim.  These letters can be found in various locations throughout both Plaintiff Trustee's and Defendant's briefing — Ex. D of the Kaminski Decl.; Ex. T of the Kaminski Decl.; Ex. W of the Kaminski Decl.; Ex. F of the Kaminski Opp'n Decl.; Ex. A of the Mallor Decl.; Ex. C of the Ragan Decl., Docket Entry No. 99-3; Ex. A of the Sparks Decl., Docket Entry No. 97-1; Ex. G of the Lepinskas Decl., Docket Entry No. 96-7; Ex. H of the Lepinskas Decl., Docket Entry No. 96-8; Ex. N of the Lepinskas Decl., Docket Entry No. 96-14; and Ex. Q of the Lepinskas Decl., Docket Entry No. 96-17.  All are part of the A Log as evidenced by a "GE" page number located on the bottom of the pages.

Plaintiff Trustee objects to the Ragan Decl. and Defendant's reliance on the A Log, (exhibited in Ex. A and Ex. C), and fax log, (Fax Log, exhibited as Ex. B, Docket Entry No. 99-2), on various grounds.  (*See* Pl.'s 56.1 Resp. at 1–3.)  The Court does not rely on the fax log and thus does not address Plaintiff Trustee's objection.  As to the A Log, the Court finds Plaintiff Trustee has waived this objection by relying on and citing portions of the A Log himself — Plaintiff Trustee submitted an excerpted A Log, via the Kaminski Decl., (*see* Ex. D), and Kaminski Opp'n Decl., (*see* Ex. F), and various letters found in the A Log.  *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (holding the district court erred in excluding plaintiff's doctor's letters where defendants submitted them in support of their motion for summary judgment, attached them as exhibits to Rule 56.1 statement and relied upon them in seeking summary judgment, thus "defendants waived any objections to the admissibility of the reports by offering them themselves"); *see also Picard Tr. for SIPA Liquidation of Bernard L. Madoff Invs. Secs. LLC v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022) ("[B]y relying on this evidence in seeking summary judgment, the defendants have 'waived any objections to the admissibility of the reports by offering them themselves.'" (quoting *Capobianco*, 422 F.3d at 55)); *Guerrero v. Constellation Health Servs., LLC*, No. 22-CV-7736, 2025 WL 2549936, at *7 n.4 (E.D.N.Y. Sep. 4, 2025) (finding where doctor's note submitted by defendants in support of their motion for summary judgment, they "waived any objections to the admissibility of the note" (quoting *Capobianco*, 442 F.3d at 55)); *U.S. Underwriters Ins. Co. v. ITG Develop. Grp., LLC*, 294 F. Supp. 3d 18, 29–30 (E.D.N.Y. 2018) (holding an insurance report admissible where a defendant disputed its admissibility generally, but at times "*himself* cited portions of the [r]eport for the truth of the matter asserted").

27.) Defendant accepted Umana's bodily injury claim (the "Umana Claim") and assigned claim number 050339622-0101-038 to the claim.[9] (Def.'s 56.1 Resp. ¶ 20.)

On July 1, 2016, Defendant called the Insured who stated, "he has an attorney handling this matter" and "asked that [Defendant] speak to the attorney." (A Log at GE 2010; *see* Def.'s 56.1 Resp. ¶ 31.) On July 5, 2016, Defendant called the Insured to "confirm accident details" who once more "advised that he has [an attorney], Christopher Wright" and provided his contact information. (A Log at GE 2004; *see* Def.'s 56.1 Resp. ¶ 32.) Call logs and the A Log indicate that Defendant and the Insured communicated several more times, twice on July 9, 2016, once on July 11, 2016, twice on July 13, 2016, and twice on July 15, 2016. (Def.'s 56.1 Resp. ¶¶ 33–36; Pl.'s 56.1 Resp. ¶ 18; A Log at GE 1995–98.) On July 26, 2016, Defendant sent a reservation of rights letter to the Insured informing them that in "investigating and/or . . . handling or defending any litigation growing out of this accident . . . [Defendant did] not waive any of the [Defendant's] rights, nor any of its obligations under the policy" and that Defendant was "making this reservation of rights because, [the Insured had] failed to cooperate in the investigation of this loss." (Pl.'s 56.1 Resp. ¶ 52; A Log at GE 1673; Reservation of Rights Letter dated July 26, 2016 1, annexed to Lepinskas Decl. as Ex. G (the "ROR"), Docket Entry No. 96-7.) The letter also stated that "[t]he service of this notice upon you does not deprive you of any rights you may have against the company, and your acknowledgement of this notice shall not be considered a waiver of your rights under said policy or policies," and "[y]ou have the right

---

[9] On July 1, 2016, Defendant assigned Eileen Mather, claims adjuster to handle the Umana Claim, (Def.'s 56.1 Resp. ¶¶ 29, 159) and Lori Cantone served as Mather's supervisor on the Umana Claim and worked on the claim in the last quarter of 2016, (*id.* ¶¶ 30, 159). On March 25, 2019, Defendant assigned claims adjuster Brunna Cornell to the Umana Claim. (*Id.* ¶¶ 160, 169.)

to retain personal counsel to advise you concerning all issues raised in this reservation of rights."
(ROR 2.)

Throughout August of 2016, Defendant and Umana's counsel, Mosely, communicated regarding the status of Umana's injuries and treatment. (Def.'s 56.1 Resp. ¶ 37.) On August 19, 2016, Defendant sent a confirmation letter to Mosely of its offer of the full policy limit of $25,000. (Letter dated Aug. 19, 2016 (the "Settlement Offer"), annexed to Lepinskas Decl. as Ex. H, Docket Entry No. 96-8; Pl.'s 56.1 Resp. ¶ 19.) Umana's attorney ultimately rejected that offer. (Pl.'s 56.1 Resp. ¶ 20.)

On September 6, 2016, Defendant and the Insured next spoke on the phone. (Def.'s 56.1 Resp. ¶ 38.) Then, on December 14, 2016, Defendant sent the Insured a status letter notifying them that the "Bodily Injury claim filed by Mario Umana . . . [was] currently open, and no final settlement ha[d] been reached . . . [and] [o]nce a final settlement has been reached, [Defendant] w[ould] contact [Haniff] to let you know that the claim has been resolved." (A Log at GE 174, 176 ("Def.'s Dec. 14, 2016 Status Letter"); Pl.'s 56.1 Resp. ¶ 53.)

### c. The commencement of the state proceeding

On September 8, 2016, Umana commenced a personal injury action against Haniff in the New York Supreme Court, Queens County, seeking to recover dagames due to the loss of Umana's leg and other injuries and the loss of services to Umana's spouse (the "Umana Lawsuit"). Compl., *Umana v. Haniff*, No. 710769/2016 (N.Y. Sup. Ct. Jan. 7, 2019), Docket Entry No. 1. That same day, the Insured called Defendant and the call lasted twenty-nine minutes. (Def.'s 56.1 Resp. ¶ 41.) In addition, the Insured and Defendant spoke for ten minutes on September 12, 2016 and three minutes on September 13, 2016. (*Id.* ¶¶ 42–43.) On

10

September 22, 2016, Haniff was served with a summons and complaint in the Umana Lawsuit. [10]

(*Id.* ¶ 44.)

After Haniff and Defendant failed to appear or otherwise respond to the Umana Lawsuit, Umana moved for a default judgment on March 7, 2017, which was granted on April 19, 2017. Notice of Mot. for Default, *Umana*, No. 710769/2016, Docket Entry No. 7; Decision and Order dated Apr. 19, 2017, *Umana*, No. 710769/2016, Docket Entry No. 13.

On April 14, 2017, Umana's attorney, Mosely, informed Defendant that the Umana Lawsuit was filed against Haniff, who was served "months ago," and that "he believe[d] that they won their default motion as well." (A Log at GE 1792; Def.'s 56.1 Resp. ¶¶ 71–72, 77.) The A Log entry further states that Defendant informed Mosely "that [Defendant was] never notified of suit/service on [Haniff]" but Mosely "said he/s not surprised and he thinks that the

---

[10]   The parties dispute when the Insured informed Defendant of the Umana Lawsuit and faxed the summons and complaint to Defendant. (Def.'s 56.1 Resp. ¶¶ 45–46.) Plaintiff Trustee alleges that the Insured informed Defendant by telephone and faxed a copy of the summons the same day she was served, as supported by Shanta Haniff's deposition testimony. (Pl.'s 56.1 ¶¶ 45–46.) Plaintiff Trustee further asserts that the Insured faxed a copy to Defendant on December 14, 2016, after receiving Def.'s Dec. 14, 2016 Status Letter, as supported by Shanta Haniff's deposition testimony. (*Id.* ¶ 51.) Defendant denies such allegations, instead asserting it received the summons on October 5, 2018 and October 9, 2018, as supported by the fax log and Ragan Decl., both of which Plaintiff Trustee objects to the use of, as noted above, *see supra* n.8. (Def.'s 56.1 Resp. ¶¶ 45–46, 51, 57; Pl.'s 56.1 Resp. ¶ 85, at 3; Kaminski Reply Decl. ¶¶ 3, 4.) Defendant also notes the December 16, 2016 A Log entry states "no [summons and complaint] at this time, no response from [Policyholder] to date." (A Log at GE 1831.) The summons appears twice in the A Log, without any notation of when the document was received or otherwise without a date. (Def.'s 56.1 Resp. ¶ 55; A Log at GE 175, 177.)

Although not articulated, it appears Plaintiff Trustee attempts to argue that Defendant was aware of the Umana Lawsuit, at the latest, in December of 2016 because Shanta Haniff alleges she sent the summons to Defendant that day and otherwise communicated with its claims adjuster about the Umana Lawsuit. The A Log entry noted above and a second entry by Lori Catone asks whether a "[personal damage] count [was] in the suit?" (A Log at GE 1831.) In her deposition testimony though, Cantone stated the note refers to a lawsuit but she believed she "made a mistake" in the entry because Defendant "[wasn't] aware at this point that a suit had definitely been filed." (Dep. Tr. of Lori Cantone ("Cantone Dep. Tr.") 48:8–49:16, annexed to Lepinskas Decl. as Ex. M, Docket Entry No. 96-13.)

11

[Haniff's] att[orney] adv[ised] him not to cooperate." (A Log at GE 1792; Def.'s 56.1 Resp. ¶ 75.) Defendant "adv[ised] him that if that's the case, [Haniff] breached his contract [ ] and cov[erage] would be in jeopardy," which Umana's attorney stated he understood, and Defendant "req[uested] a copy of the suit" which Mosely said he "w[ould] try to send it." (A Log at GE 1792; Def.'s 56.1 Resp. ¶ 75.) That same day, on behalf of Defendant, Cantone instructed Mather to follow up with the Insured to see if he was served, as was normal business practice after an adjuster was provided with information that a lawsuit was filed. (Def.'s 56.1 Resp. ¶¶ 78, 90.) Cantone did not give Mather instructions to hire defense counsel after being advised by Umana's attorney that a lawsuit had been filed.[11] (*Id.* ¶ 86.) Mather did not recall whether she called the Policyholder after Cantone instructed her to do so, (*id.* ¶ 91), and no call is noted on the A Log, (A Log at GE 1792).

On April 17, 2017, Defendant unsuccessfully called Haniff's attorney, Wright, and left a message advising him that Defendant was "informed that there is a suit served and a possible default motion." (A Log at GE 1792; Pl.'s 56.1 Resp. ¶ 84; Def.'s 56.1 Resp. ¶ 81.) On April

---

[11] Defendant clarified in its 56.1 Response that it "had to confirm service before [it] referred it to counsel." (Def.'s 56.1 Resp. ¶ 86.) However, Defendant admits that "Mather is unaware of any written rule whereby [Defendant] advises its adjusters not to refer any case to an attorney unless they have a summons and complaint or affidavit of service," (*id.* ¶ 95), and "unaware of any [Defendant] policy whereby [Defendant] advises its adjusters not to refer any case to an attorney unless they have a summons and complaint or affidavit of service," (*id.* ¶ 96).

Defendant further admits that supervisor Aisling Santos testified that E-Courts and E-Law were "available to 'find out what was going on' [from] the Court system," although Santos testified that she could not say she's "personally used it." (*Id.* ¶ 105.) A Log entries reflect that Mather checked E-Law on June 13, 2018 and September 21, 2018 but was unable to find the Umana Lawsuit. (A Log at GE 1696, 1709; *see also* Def.'s 56.1 Resp. ¶ 97.) Defendant admits that Mather and Cantone "never checked the court's website to access case information regarding the Umana [L]awsuit at any time during the pendency of the claim." (Def.'s 56.1 Resp. ¶ 158.) Defendant lastly admits that newly assigned claims adjuster "Cornell signed into the court website and was able to access the Umana [L]awsuit paperwork within 2 to 5 minutes on March 26, 2019." (*Id.* ¶ 161.)

26, 2017, Defendant called Wright again and left a message "advising [that Defendant was] informed his client was served with a [summons and complaint] and [Defendant had] not rec[eived] a copy" and asking for a call back.  (A Log at GE 1789.)  Defendant called Wright once more on May 5, 2017 and spoke with him, during which he explained he only represented Haniff in the criminal case against him, not the civil case.  (A Log at GE 1787.)  The A Log entry also notes that Defendant called the Insured and left a voicemail "advising the importance of his cooperation."[12]  (*Id.*)

On May 25, 2017, Defendant sent a letter to the Policyholder[13] informing that Defendant "offered the full policy limits . . . to plaintiff's attorney in an effort to settle [the Umana

---

[12]  Defendant submits Ex. A of the Sparks Decl. which, it argues, includes twenty-four letters Defendant allegedly sent to the Insured between May 8, 2017 and December 11, 2017 in connection with the Umana Claim, the possibility of a lawsuit involving the Umana Claim arising out of the Accident, and eventually the Umana Lawsuit, and either offering assistance, asking to be contacted and/or asking for the documents related to the Umana Lawsuit.  (Ex. A of Sparks Decl. 5–27, 35.)  Ex. A also includes fourteen other similar letters allegedly sent to the Insured between April 25, 2018 and September 24, 2018.  (*Id.* at 28–34, 36–42.)  All of these letters have a "GE" number, indicating they are part of the A Log.  Plaintiff Trustee objects to the admissibility of these letters on numerous grounds, predominantly on the "grounds that insurance company records are hearsay if offered for their truth in a breach of contract case and defendants have not set forth a proper foundation under [Fed. R. of Evid.] 803(6)."  (Pl.'s 56.1 Resp. ¶¶ 53–80.)  Plaintiff Trustee also claims that Defendant has failed to establish a "foundation for the witness's personal knowledge of the matter" (citing Fed. R. of Evid. 602), "[n]on-party witness Shanta Haniff denies receiving this letter," which "creates a genuine issue of material fact requiring resolution by the fact-finder at trial," and as a "non-party witness, this is an additional level of hearsay."  (*Id.*)  As discussed above, *see supra* n.8, Plaintiff Trustee has waived any objection to the admissibility of the A Log or its contents by relying on parts of it in his briefing.  Further, Plaintiff Trustee acknowledges the existence of several of these letters by either submitting the letter with his briefing or not disputing the letters in his 56.1 Resp.  (*See, e.g.*, ROR.)  This finding bears no weight on Shanta Haniff's denial of receiving any of these letters, which she still may dispute at trial.

[13]  While Defendant does not explicitly admit to sending the May 25, 2017 letter, its objections in Def.'s 56.1 Opp. acknowledge the letter and only dispute the intention and meaning of the letter's content.  (*See* Def.'s 56.1 Opp. ¶¶ 122, 124, 125, 127, 147, 176.)  Further, the letter is included in Ex. A of the Sparks Decl. which Defendant submitted in support of its motion for summary judgment.  (A Log at GE 47, annexed to Sparks Decl. in Ex. A 9.)

Lawsuit]" which was rejected. (A Log at GE 211, annexed to Kaminski Decl. as Ex. V, Docket Entry No. 87-23; *see* A Log at GE 47, annexed to Sparks Decl. in Ex. A 9; *see also* Pl.'s 56.1 Resp. ¶ 20.) The letter also advised the Insured that he had "the right under the above-mentioned policy to hire [his] own attorney, at [his] own expense, to aid in [his] defense," while he "need not do so," and recommended that he consult with a private attorney regardless. (A Log at GE 211.) If he chose to retain private counsel, his "defense attorney will defend [his] interest" and Defendant would "work closely with [his] private attorney." (*Id.*)

### d. The entry of default in the state proceeding

On June 13, 2017, Umana moved for an entry of default. Notice of Entry of Default J., *Umana*, No. 710769/2016, Docket Entry No. 15.

On July 21, 2017, Defendant submitted a request for PM Legal Investigations, a private investigator, to contact the Policyholder, noting in the A Log that Mather "submitted [a request] for PM [Legal Investigations] to attempt contact with [the Insured], need cooperation, [summons and complaint]?" (A Log at GE 1768; *see* Mallor Decl. ¶ 4; Def.'s 56.1 Resp. ¶¶ 128–29.) Defendant submitted the Mallor Decl. which asserts that a member of the PM Legal Investigations department spoke with Shanta Haniff, during which she "confirmed her address and contact phone number" and the investigator "provided Ms. Haniff with the name and contact phone number for Eileen Mather at GEICO" to which she "stated that she would contact GEICO's office."[14] (Mallor Decl. ¶ 5; *see also* Def.'s 56.1 Resp. ¶ 130.) PM Legal

---

[14] Plaintiff Trustee does not dispute or object to the Mallor Decl., and it is noted that Plaintiff Trustee's 56.1 Statement, which Defendant admits to, asserts that PM Legal Investigations "submitted a report alleging that they 'made contact' with S. Juggernauth Haniff (Shanta Haniff) on July 31, 2017." (Def.'s 56.1 Resp. ¶ 130.) The A Log also indicates that Defendant received the PM Legal Investigations report, that PM Legal Investigations reached Shanta Haniff at the "address on file," and "she told [PM Legal Investigations] she would call [Defendant]." (A Log at GE 1760–61, 1767.)

14

Investigations submitted a letter to Defendant dated July 31, 2017 "describing [PM Legal Investigations'] interaction with Ms. Haniff." (Mallor Decl. ¶ 6; PM Legal Report 1, annexed to Mallor Decl. as Ex. A, Docket Entry No. 100-1; A Log at GE 289.) It is undisputed that Mather did not request PM Legal Investigations to obtain the summons and complaint for the Umana Lawsuit.[15] (Def.'s 56.1 Resp. ¶¶ 85, 135.) The letter also included an invoice dated August 8, 2017 showing a flat rate charge of $350.00 for "Locate Insured" services, with a date of service of July 31, 2017, and without an indication "that the investigator was ever tasked with obtaining legal papers from the insured." (Def.'s 56.1 Resp. ¶¶ 133–34; A Log at GE 290; PM Legal Report 2.)

On October 25, 2017, Mather created an A Log entry stating that she has "been unable to obtain a copy of the [summons and complaint]," "[t]o date [the Policyholder] has not cooperated with this loss and does not return any calls or letters." (A Log at GE 1756.) She also noted in an A Log entry that the "PM [Legal Investigations] did reach [the Policyholder] and they said they would contact us but have not." (*Id.*) Mather further noted that she had "not referred suit to [defense counsel] because [she did not] have an[y] information on the [summons and complaint] from anyone involved," and she would "continue to try to get cooperation from [the Insured]." (A Log at GE 1756–57.)

On November 15, 2017, Mather called Umana's attorney and left a voicemail requesting a copy of the summons and complaint. (A Log at GE 1747.) On November 16, 2017, Defendant sent another letter to the Insured in connection with the Umana Lawsuit, identical to the letter

---

[15] Defendant clarifies in its 56.1 Resp. that Mather's deposition testimony states "asking investigators to obtain the [s]ummons and [c]omplaint is not something she would have done in her normal course of practice." (Def.'s 56.1 Resp. ¶ 106; *see* Dep. Tr. of Eileen Mather ("Mather Dep. Tr.") 104:21–105:6, annexed to Kaminski Decl. as Ex. E, Docket Entry No. 87-6.)

dated May 25, 2017. (A Log at GE 212.) On February 1, 2018, Mather attempted to reach Umana's attorney again and once more left a message asking for a callback. (A Log at GE 1726.) On March 22, 2018, Mather wrote an A Log entry stating, "if suit is filed, I will request [defense counsel] to handle." (A Log at GE 1717.) On April 24, 2018, Mather noted in the A Log that she received a call back from Umana's attorney stating the "suit is in default." (A Log at GE 1715.) Mather asked that Umana's attorney send a copy of the affirmation of service, which he stated he was "unwilling" to do. (*Id*.) An A log entry from June 13, 2018 notes that Mather "checked [E-Law] under name for [the summons and complaint], checked 2016–2018, unable to find a suit filed."[16] (A Log at GE 1709.) On July 20, 2018, Mather attempted to call Haniff's attorney, Wright, but reached a full voicemail and was unable to leave a message. (A Log at GE 1706.) On July 26, 2018, Mather noted in the A Log that she called Umana's attorney, Mosely, and left a voicemail asking for a copy of the summons and complaint or index number. (A Log at GE 1702.)

On August 21, 2018, the state court held an inquest and Justice Sidney F. Strauss rendered a verdict in the amount of $10,000,000.00. (Def.'s 56.1 Resp. ¶¶110–11.) Order of Reference for Inquest, *Umana*, No. 710769/2016, Docket Entry No. 20; *see generally* Inquest Tr., *Umana*, No. 710769/2016, Docket Entry No. 21.

---

[16] Cantone, in her deposition, explained that E-Law was where "[y]ou could search for court cases, and you could find certain things on there. Sometimes you can find documents. You can find if there's scheduled appearances. If there's any motions, sometimes you can find out the decisions on those motions." (Cantone Dep. Tr. 43:20–44:20.) She stated that she "d[id] not] believe" Defendant's claims adjusters and supervisors had access to E-Law between 2016 through 2019 or whether Defendant had a subscription to E-Law during that timeframe. (*Id*.)

E-Law is different from the New York State Court's electronic filing system ("NYSCEF" or "E-Courts"), which Cantone stated that she was not "aware" of whether Defendant's claims adjusters and supervisors received training or instructions regarding the NYSCEF system between 2016 and 2019. (*Id.* at 42:16–43:12.)

On August 24, 2018, Mather attempted and failed to reach Umana's attorney, leaving a message asking for the summons and complaint. (A Log at GE 1701.) Mather checked E-Law on September 21, 2018 but was "unable to find [Umana] or [Haniff] listed." (A Log at GE 1696.) Defendant asserts that it first received the summons on October 5, 2018, and a second time on October 9, 2018.[17] (Def.'s 56.1 ¶¶ 42–43, 47, 86; Def.'s 56.1 Resp. ¶¶ 45–46, 51, 57.)

###### e. The state court's entry of judgment and subsequent events

On January 7, 2019, the state court entered judgment in the amount of $10,000,000 plus interest against Haniff (the "Umana Judgment"), totaling $10,331,690.96. (Def.'s 56.1 Resp. ¶ 112.) J., *Umana*, No. 710769/2016, Docket Entry No. 23.

On March 3, 2019, Mather notes in the A Log that she received the first page of the summons and complaint and reviewed the case on E-Law which stated the case was disposed of. (A Log at GE 1681; Def.'s 56.1 Resp. ¶ 139.) On March 22, 2019, Mather entered another A Log entry stating she "reviewed case on [E-Law] . . . default motion 3/30/2017 was decided and JHO inquest held 8/21/18. We were not notified of the suit or service." (A Log at 1680–81.) Between March 25 and 26, 2019, Defendant held internal meetings to discuss the Umana Claim and the Umana Lawsuit. (Def.'s 56.1 Resp. ¶¶ 163–64.) An A Log entry from March 26, 2019

---

[17] Defendant's assertion relies on the fax log submitted as an exhibit to the Ragan Decl. (Fax Log.) Plaintiff Trustee disputes the "validity, accuracy and completeness" of the fax log and as noted above, he contends Defendant's assertion is not supported by admissible evidence. *See supra* n.8. (Pl.'s 56.1 Resp. ¶¶ 85, 86.)

Instead, Plaintiff Trustee premises its objections upon Shanta Haniff's deposition testimony — that she informed Defendant by telephone and faxed a copy of the summons the same day they were served, (Pl.'s 56.1 ¶¶ 45–46), and that she faxed a copy to Defendant on December 14, 2016 after receiving Defendant's Dec. 14, 2016 Status Letter, (*id.* ¶ 51). Further, Plaintiff Trustee points out there is no A Log entry between October 5, 2018 and October 9, 2018 stating the summons was received (aside from one entry on October 8, 2015 noting a fax of two pages was received on October 5, 2018) and the first A Log entry discussing the summons and complaint was on March 3, 2019, where Mather wrote that she received the first page of the summons and complaint, checked E-Law where it was marked disposed and that she would call Umana's attorney. (A Log at GE 1681, 1695–96.)

from John Ekstrom states that Defendant did "not have answers to the critical questions regarding service upon [the Insured]," that they needed "to confirm that this is in fact [Defendant's] first notice ever of the [summons and complaint]," and "would not wait upon [the Policyholder's] counsel getting back to [Defendant]" instead they should call the Insured "directly however mak[ing] sure [to] discuss the issue and nothing else."  (A Log at GE 1678; *see* Def.'s 56.1 Resp. ¶¶ 140–45.)  A later A Log entry describes Defendant's call with Shanta Haniff in which she stated the papers came to her house, after which she contacted her "personal attorney" who "stated don't answer until their case is finish[ed], however told her to send to [Defendant] [ ] and [she subsequently] faxed [ ] everything to [Defendant]."  (A Log at GE 1677.)  A third entry describes Defendant's call with Aftabadeen Haniff who "[a]fter denying and stating he received a lot of paperwork, Insured then stated he remembered receiving [sic] paperwork w/ suit naming him[ and his] son . . . but his criminal [attorney] told him to don't do anything or talk to anyone about case."  (A Log at GE 1674.)  Lastly, a fourth entry describes Defendant's conversation with Haniff's attorney, Wright, explaining "he stated [he] doesn't know if [Haniff] was served as he only represent[s] them for the criminal case."  (A Log at GE 1675–76.)

On April 16, 2019, Defendant sent a disclaimer letter to the Insured disclaiming and denying coverage (the "Disclaimer Letter"), (Def.'s 56.1 Resp. ¶ 166, Pl.'s 56.1 Resp. ¶ 51), on the grounds of untimely notice and lack of cooperation stating the "disclaimer [was] made because you, or any party representing you; failed to provide [Defendant] with timely notice of the [Umana Lawsuit]," (A Log at GE 257–58).  The Disclaimer Letter includes quoted language from condition 1, "Notice," and 3, "Assistance and Cooperation of the Insured" from the Policy.  (*Id.*)  However, on or about May 20, 2019, Defendant paid its $25,000 policy limit to Umana, his

18

wife, and his counsel, Mosely.  (Def.'s 56.1 Resp. ¶ 178; Application for an Order Quashing the Subpoena Dated Jan. 29, 2021, for Rule 2004 Examination Issued by Chapter 7 Trustee and/or for a Protective Order (the "Bankruptcy Motion to Quash") 16, annexed to Kaminski Decl. as Ex. Y, Docket Entry No. 87-26; A Log at GE 1659.)

Defendant admits it failed to "retain counsel to appear on behalf of its [I]nsureds or defend its [I]nsured in the Umana [Lawsuit] during the foregoing period."  (Def.'s 56.1 Resp. ¶¶ 47, 65, 68, 113, 121.)

### f.    The bankruptcy proceeding

Subsequent to entry of the Umana Judgment, on October 31, 2019, Haniff filed for bankruptcy protection under Chapter 7 of Title 11 of the United States Code in the Eastern District of New York Bankruptcy Court.  (Def.'s 56.1 Resp. ¶ 115.)  *See In re Haniff*, No. 19-BJ-46590.  Richard J. McCord was appointed as Chapter 7 Trustee of Haniff's estate.  *See id.*  On or about February 12, 2021, Defendant's then-attorneys represented to the Bankruptcy Court that Defendant "waived viable late notice and lack of cooperation defenses to coverage," which Defendant admits but notes "that the representation was in connection with an explanation that [Defendant] 'willingly paid its $25,000' limits."  (Def.'s 56.1 Resp. ¶ 178; Bankruptcy Motion to Quash 16.)  *See* Bankruptcy Motion to Quash 16, *In re Haniff*, No. 19-BJ-46590, Docket Entry No. 32.

On October 13, 2022, Plaintiff Trustee filed a complaint against Defendant in the Bankruptcy Court (the "Adversary Proceeding"), alleging breach of contract and bad faith.  (Compl.)  *See McCord*, No. 22-AP-1081.  On November 29, 2022, Defendant filed its Motion to Withdraw Bankruptcy Reference, asking the Court to withdraw the reference of the Adversary Proceeding in Bankruptcy Court, which Plaintiff Trustee opposed.  (*See* Def.'s Motion to Withdraw Bankruptcy Reference; Pl.'s Opp'n to Def.'s Motion to Withdraw Bankruptcy

19

Reference.)  By Memorandum and Order dated June 27, 2023, the Court granted Defendant's

Motion to Withdraw Bankruptcy Reference.  (Bankruptcy Reference Withdrawal Decision.)

### g.   The instant action

Plaintiff Trustee originally alleged against Defendant (1) a breach of contract claim,

based on Defendant's alleged breach of its insurance contract with the Policyholder, the Policy,

and (2) a bad faith claim, based on Defendant's alleged bad faith in failing to defend Haniff in

the Umana Lawsuit.  (Compl.)  Plaintiff Trustee seeks damages in the full amount of the Umana

Judgment.  (*Id.* at 16–17.)  On September 14, 2023, Plaintiff Trustee filed a demand for a trial by

jury.  (Jury Demand.)

On November 6, 2023, Defendant moved for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure, and Plaintiff Trustee opposed the motion.[18]  On

August 26, 2024, the Court denied Defendant's motion as to Plaintiff Trustee's breach of

contract claim and demand for consequential damages and granted Defendant's motion as to

Plaintiff Trustee's bad faith claim.  (Mem. and Order dated Aug. 26, 2024, Docket Entry No.

51.)

## II.   Discussion

### a.   Standard of review

#### i.   Rule 56 – Summary Judgment

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Chislett v.

N.Y.C. Dep't of Educ.*, 157 F.4th 172, 183 (2d Cir. Sep. 25, 2025) (quoting Fed. R. Civ. P.

---

[18]  (Def.'s Notice of Mot. for J. on the Pleadings, Docket Entry No. 20; Def.'s Mem. in Supp. of Def.'s Mot. for J. on the Pleadings, Docket Entry No. 22; Pl.'s Opp'n to Def.'s Mot. for J. on the Pleadings, Docket Entry No. 23; Def.'s Reply in Supp. of Def.'s Mot. for J. on the Pleadings, Docket Entry No. 24.)

56(a)); *Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir.) (quoting same), *amended on reh'g in part*, 151 F.4th 13 (2d Cir. 2025); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting same). The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). *See also Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party." (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013))). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Lara-Grimaldi v. County of Putnam*, 132 F.4th 614, 633 (2d Cir. 2025) (quoting *Porter v. Dartmouth-Hitchcock*, 92 F.4th 129, 147 (2d Cir. 2024)); *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.*; *see Solid 21, Inc. v. Breitling U.S.A., Inc.*, 96 F.4th 265, 276 (2d Cir. 2024) ("The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the trier of fact could reasonably find for the non-movant." (quoting *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996))). The court's function is to decide whether, "after resolving all ambiguities and drawing

21

all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia*, 706 F.3d at 127, 129); *see Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000) ("The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."); *see also Chislett*, 157 F.4th at 183 ("Summary judgment should be granted only if 'there is no genuine dispute as to any material fact' . . . . A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" (first quoting Fed. R. Civ. P. 56(a); then quoting *Anderson*, 477 U.S. at 248)); *Capitol Recs.*, 125 F.4th at 418 ("[A] genuine dispute as to a material fact precludes summary judgment 'where the evidence is such that a reasonable jury could decide in the non-movant's favor.'" (quoting *Lucente v. County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020))).  When there are cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for either side. *Ricci v. DeStefano*, 530 F.3d 88, 109–10 (2d Cir. 2008).  "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 110 (quoting *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

> ii.   **Rule 702 – Motion to strike expert report and preclude expert testimony**

"The admission of expert testimony is governed primarily by the Federal Rules of Evidence." *United States v. Walker*, No. 18-3506, 2023 WL 3451419, at *1 (2d Cir. May 15,

22

2023); *see also Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024) (explaining that "Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony," but that "a judge . . . should also be mindful of other applicable rules" (citation omitted)). Rule 702 of the Federal Rules of Evidence was recently amended, and this new amendment took effect December 1, 2023. The rule now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Faison-Williams v. United States*, No. 24-1404, 2025 WL 974831, at *3 (2d Cir. Apr. 1, 2025) (summary order) (quoting Fed. R. Evid. 702). "The district court plays the role of gatekeeper, determining whether the expert's testimony is reliable and relevant." *Faison-Williams*, 2025 WL 974831, at *3 (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)); *see United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) ("While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted))); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) ("The proponent of expert testimony bears the burden of establishing admissibility, with the district court serving a gatekeeping role to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting *Williams*, 506 F.3d at 160)); *United States v. Farhane*,

634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (citations omitted)).

Prior to permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) "the opinion is based upon reliable data and methodology"; and (3) the expert's testimony on a particular issue will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005) (quoting Fed. R. Evid. 702); *see also Bustamante*, 100 F.4th at 427 ("Under this rule, the [d]istrict [c]ourt . . . is charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." (emphasis, internal quotation marks and citations omitted)); *United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that the court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (quoting same). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors, in addition to the criteria set forth in Rule 702, that bear on the determination of reliability:

> (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v. Wilbern*, No. 20-3494, 2022 WL 10225144, at *1 (2d Cir. Oct. 18, 2022) (quoting same); *United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (quoting same); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999)) (similar). The *Daubert* inquiry for reliability is a "flexible one" and does

not "constitute a definitive checklist or test," *Kumho Tire*, 526 U.S. at 141, 150 (citation omitted), and thus, the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts or in every case," *United States v. Green*, No. 22-3217, 2024 WL 4488577, at *1 (2d Cir. Oct. 15, 2024) (alteration in original) (citation omitted), *cert. denied*, 145 S. Ct. 1216 (2025).

The "district court is afforded 'the same broad latitude when it decides how to determine reliability as it enjoys [with] respect to its ultimate reliability determination.'" *Id.* (emphasis omitted) (quoting *Kumho Tire*, 526 U.S. at 142); *see also Kumho Tire*, 526 U.S. at 142 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)). Expert testimony should be excluded if it is "speculative or conjectural." *United States v. Rivera*, No. 22-2780, 2024 WL 2813548, at *3 (2d Cir. June 3, 2024) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)), *cert. denied*, 145 S. Ct. 1099 (2025); *Jones*, 965 F.3d at 162 (quoting same); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (quoting same). When an expert's opinion is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 113 (2d Cir. 2023) (quoting *Amorgianos*, 303 F.3d at 266); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (quoting same); *see also Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec.*, 522 U.S. at 146)). "Nevertheless, in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *U.S. Small Bus. Admin. v. Feinsod*, No. 17-CV-3586,

25

2025 WL 1677409, at *7 (E.D.N.Y. June 13, 2025) (internal quotation marks and citation omitted); *see Adams v. Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267) (same).

### iii.   Rules 6, 38, and 39 – Motion for leave to file Jury Demand and motion to strike Jury Demand

"Rule 38 provides that a party may demand a jury trial '[o]n any issue triable of right by a jury' by 'serving the other parties with a written demand . . . no later than [fourteen] days after the least pleading directed to the issue is served . . . .'" *Bolmeier v. N.Y. Waterway/East River Ferry*, No. 18-CV-5488, 19-CV-1852, 2025 WL 2779286, at *2 (E.D.N.Y. Sep. 30, 2025) (quoting Fed. R. Civ. P. 38(b)(1)); *see Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007) ("Under Federal Rule of Civil Procedure 38(b), [a]ny party may demand a trial by jury of any issue triable of right by a jury." (internal quotation marks omitted) (quoting same); *Ammirato v. Duraclean Intern., Inc.*, No. 07-CV-5204, 2009 WL 3823342, at *1 (E.D.N.Y. Nov. 16, 2009) (quoting Fed. R. Civ. P. 38(b)). "A party waives a jury trial unless its demand is properly served and filed." Fed. R. Civ. P. 38(d); *Bolmeier*, 2025 WL 2779286, at *2 (quoting Fed. R. Civ. P. 38(d)); *Lateral Recovery LLC v. Funderz.Net., LLC*, No. 22-CV-2170, 2024 WL 5077628, at *2 (S.D.N.Y. Dec. 11, 2024) (quoting same); *Capak v. Epps*, 673 F. Supp. 3d 425, 428 (S.D.N.Y. May 16, 2023) (quoting same). "Issues on which a jury trial is not properly demanded are to be tried by the court." Fed. R. Civ. P. 39(b); *Lucero v. Somich Deli, Inc.*, No. 15-CV-413, 2016 WL 796853, at *2 (S.D.N.Y. Feb. 24, 2016) (quoting Fed. R. Civ. P. 39(b)); *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 46 (E.D.N.Y. 2010) (quoting same).

"Notwithstanding Rule 38, if a jury trial is not properly demanded, Rule 39 provides that 'the court may, on motion, order a jury trial on any issue for which a jury might have been

26

demanded," thus excusing a delay in requesting a jury trial. *St. Anne's Devel. Co., LLC v. Lenz*, No. 08-CV-1730, 2011 WL 5401715, at *1 (E.D.N.Y. Sep. 2, 2011) (quoting Fed. R. Civ. P. 39(b)); *see Chen v. Hunan Manor Enter., Inc.*, 340 F.R.D. 85, 88 (S.D.N.Y. 2022) ("Compliance with [Rule] 38(b) is not the only means by which a party may obtain a trial by jury . . . [Rule] 39(b) provides that any issue for which a jury trial has not been properly demanded is to be tried by the court, except that 'the court may, on motion, order a jury trial on any issue for which a jury might have been demanded.'" (quoting Fed. R. Civ. P. 39(b)); *Lucero*, 2016 WL 796853, at *2 ("[B]oth Rules 38(d) and 39(b) provide that, by default, a party waives its right to a civil jury trial when it does not demand one, with Rule 39(b) permitting a party to move thereafter for a jury trial if it has failed to make a demand."); *Encarnacion v. Isabella Geriatric Ctr.*, No. 11-CV-3757, 2014 WL 4494160, at *2 (S.D.N.Y. Sep. 11, 2014) ("Improper and untimely demands for a jury trial are controlled by Rule 39(b) of the Federal Rules of Civil Procedure . . . [and] [d]istrict courts [ ] have discretion to order a jury trial even when it was improperly demanded."). District courts "ha[ve] the discretion to deny a late jury demand." *Townsend v. Clairol Inc.*, 26 F. App'x 75, 77 (2d Cir. 2002). The Second Circuit has held that "mere inadvertence in failing to make a timely jury demand does not warrant a favorable exercise of discretion under Rule 39(b)." *Noonan v. Cunard S.S. Co.*, 375 F.2d 69, 70 (2d Cir. 1967); *see Raymond v. Int'l Business Machines Corp.*, 148 F.3d 63, 65 (2d Cir. 1998) (quoting *Noonan*, 375 F.2d at 70); *Westchester Day School*, 504 F.3d at 356 (quoting same); *St. Anne's Devel. Co., LLC*, 2011 WL 5401715, at *1 (quoting same); *see also Galella v. Onassis*, 487 F.2d 986, 996–97 (2d Cir. 1973) ("Untimely requests for jury trial must be denied unless some cause beyond mere inadvertence is shown." (citing *Noonan*, 375 F.2d at 70)). "Only a 'showing *beyond* mere inadvertence' would justify Rule 39(b) relief." *Raymond*, 148 F.3d at 65 (quoting *Noonan*, 375 F.2d at 70).

27

"[D]espite the discretionary language of Rule 39(b) some cause beyond mere inadvertence must be shown to permit granting an untimely demand." *Higgins v. Boeing Co.*, 526 F.2d 1004, 1006 n.2 (2d Cir. 1975).

Further, Federal Rules of Civil Procedure 6(b)(1) provides that "when an act may or must be done within a specified time, the court may, for good cause, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or (B) on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6. "[T]he plain text of Rule 6(b)([1]) suggests that the rule is meant to apply to the time constraint imposed by Rule 38(b)." *Raymond*, 148 F.3d at 66. "The Second Circuit has held that an untimely motion for a jury trial which cannot be granted under Rule 39(b) may in some cases be granted under Rule 6(b)([1])." *Lateral Recovery LLC*, 2024 WL 5077628, at *3 (citing *Raymond*, 148 F.3d at 66). A showing of "mere inadvertence" under Rule 39(b) does not necessarily "preclude a district court from granting a Rule 6(b)(1) motion in appropriate circumstances" to permit an untimely jury demand. *Raymond*, 148 F.3d at 66–67. Instead, "mere inadvertence, without more, *can* in some circumstances be enough to constitute 'excusable neglect' justifying relief under Rule 6(b)([1])." *Id.* at 66. "The Supreme Court held that the inquiry into whether a failure to abide by a specified time constraint constitutes 'excusable neglect' is 'at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission,' including prejudice to the other party, the reason for the delay, its duration, and whether the movant acted in good faith." *Id.* (quoting *Pioneer Invest. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). "[E]xcusable neglect is an 'elastic concept [that] is not limited strictly to omissions caused by

28

circumstances beyond the control of [the] movant.'" *Petaway v. Oden*, 827 F. App'x 150, 152 (2d Cir. 2020) (quoting *LoSaco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995)).

>    **b.   The Court grants in part and denies in part Plaintiff Trustee's motion for summary judgment and denies Defendant's cross-motion for summary judgment in its entirety**

Plaintiff Trustee argues that he is entitled to summary judgment because he has demonstrated that: (1) Defendant violated its contractual duty to defend as a matter of law, (Pl.'s Mem. 6–8); (2) Defendant's Disclaimer Letter was untimely, lacked the required specificity, and was made in bad faith, (*id.* at 8–15); (3) Defendant specifically waived any late notice and/or lack of cooperation defenses, (*id.* at 16); and (4) Defendant breached its duty to defend in bad faith, warranting the recovery of consequential damages, (*id.* at 16–25).

Defendant argues that it is entitled to summary judgment because it has demonstrated that: (1) Plaintiff Trustee's false reporting of the Accident and otherwise non-cooperation establish the Insured breached the Policy from the outset, (Def.'s Opp'n 12–13, 14–16); (2) Plaintiff Trustee cannot establish causation requirements necessary to a failure to defend claim as he cannot show the Insured lost an actual opportunity to settle within coverage limits nor prove the Policyholder had a viable defense, (Def.'s Mem. 8–12); and (3) Plaintiff Trustee cannot establish Defendant acted in "gross disregard" of the Insured's interests when it failed to defend the Umana Lawsuit to satisfy the standard for bad faith, (*id.* at 12–20).

>    **i.   Defendant breached its contractual duty to defend**

Plaintiff Trustee argues "[t]here is no dispute that the vehicular accident and resulting bodily harm which [is] the subject of the [Umana Lawsuit] was covered by the [Policy] and that, therefore, [Defendant] had a duty to defend Ameer Haniff." (Pl.'s Mem. 7.) In support, Plaintiff Trustee contends that Defendant's duty to defend was triggered when the Policyholder, based on Shanta Haniff's testimony, provided timely notice of the commencement of the Umana Lawsuit

and when Defendant was made aware of the progress of the Umana Lawsuit by Umana's attorney during the course of the Umana Lawsuit, including in April of 2017. (*Id.* at 7–8.) Thus, Plaintiff Trustee argues that Defendant was required to provide a defense to the Policyholder which Defendant failed to provide by incurring the default judgment. (*Id.* at 6–8; Pl.'s Opp'n 5–6.) Specifically, as to Defendant's potential defenses, Plaintiff Trustee claims Defendant has failed to satisfy black-letter law for its untimely notification and lack of cooperation defenses and waived any false reporting defense by failing to disclaim on this basis in the ROR and Disclaimer Letter. (Pl.'s Opp'n 13–16.) Nevertheless, Plaintiff Trustee contends that Defendant waived any defenses to late notice and lack of cooperation when it submitted its Bankruptcy Motion to Quash, as its brief states "[Defendant] willingly paid its $25,000 and in the process waived viable late notice of claim and lack of cooperation defenses to coverage." (Pl.'s Mem. 16; Bankruptcy Motion to Quash 16; Pl.'s Reply 5; Pl.'s Opp'n 25.)

Defendant admits that it failed to defend the Policyholder in the Umana Lawsuit. (Def.'s 56.1 Resp. ¶¶ 47, 65, 68, 113, 121.) Instead, Defendant argues that it should be relieved of its duty to defend and/or excused from its subsequent breach of that duty because (1) the Policyholder failed to provide timely notice of the Umana Lawsuit and Plaintiff Trustee's arguments otherwise rely on the "uncorroborated testimony of the [Policyholder]," (Def.'s Opp'n 2, 10–11), and (2) the Policyholder was in breach of the Policy by reporting false information and otherwise not cooperating with Defendant's investigation, (*id.* at 12–13, 14–16). While not specifically arguing for a lack of cooperation defense, Defendant argues that "[Plaintiff Trustee] ignores that it was the [Policyholder's duty] under her policy to promptly forward the [s]ummons & [c]omplaint." (Def.'s Opp'n 18–19.) Defendant contends that while the "[P]olicyholder had ample opportunity and encouragement to fulfill her contractual duty to promptly send the

30

[s]ummons & [c]omplaint to [Defendant]," Plaintiff Trustee "does not explain why the [P]olicyholder continued to ignore [Defendant]'s requests for cooperation, or why her criminal counsel refused to honor his promise to send the pleadings to [Defendant.]" (*Id.*)  As to Plaintiff Trustee's waiver argument**,** Defendant contends that Plaintiff Trustee's "argument relies on a misunderstanding of the nature of judicial admissions" and "improperly ask[s] the Court to attach legal significance to [Defendant's] use of the words 'waive' and 'defenses' which do not constitute statements of fact."  (Def.'s Opp'n 19–20.)  Even if the Court gives weight to Defendant's representation in the Bankruptcy Motion to Quash, Defendant contends that while it "waived its right to deny *coverage* after it paid the $25k policy limits, [Defendant] never waived its right to raise defenses to [Plaintiff Trustee's] *bad faith claim* seeking an award of over $10 million on an excess verdict."[19]  (Def.'s Opp'n 19–20; Def.'s Reply 9.)

"Under New York law, to make out a viable claim for breach of contract, a plaintiff must prove (1) 'the existence of a contract,' (2) 'adequate performance of the contract by [the plaintiff],' (3) 'breach of the contract by [the defendant],' and (4) 'damages.'" *N.A. Photon Infotech Ltd. v. ZoomInfo LLC*, Nos. 22-1979, 22-2074, 2024 WL 4799843, at *1 (2d Cir. Nov. 15, 2024) (alterations in original) (quoting *24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 41–41 (2d Cir. 2005) (emphasis omitted)); *see Up State Tower Co., LLC v. Town of Cheektowaga*, No. 24-165, 2025 WL 444207, at *1 (2d Cir. Feb. 10, 2025) ("A breach of contract claim under New York law has four elements: '(i) the formation of a contract between

---

[19]  The Court need not address whether Defendant waived any defenses to coverage in its Bankruptcy Motion to Quash because, as addressed below, both of Defendant's untimely notice and lack of cooperation defenses fail as a matter of law.  However, the Court agrees that a plain reading of the Motion to Quash states that it "waived viable late notice of claim and lack of cooperation defenses to *coverage*," which does not preclude Defendant from raising these issues in response to Plaintiff Trustee's argument that it breached its duty in bad faith.  (Bankruptcy Motion to Quash 16.)

the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)));

*Hernandez v. Kwiat Eye and Laser Surgery, PLLC*, No. 23-7679, 2024 WL 5116365, at *5 (2d Cir. Dec. 16, 2024) ("To sustain a breach-of-contract claim under New York law, a plaintiff must show: (1) a valid contract; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." (citing *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004))).

### 1. Defendant breached its duty to defend the Policyholder in the Umana Lawsuit

New York courts have defined an insurer's duty to defend policyholders against claims as "exceedingly broad." *Atl. Ave. Sixteen AD, Inc. v. Valley Forge Ins. Co.*, 56 N.Y.S.3d 207, 209 (App. Div. 2017) (internal quotation marks and citation omitted); *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310 (1984) ("Where an insurance policy includes the insurer's promise to defend the insured against specified claims as well as to indemnify for actual liability, the insurer's duty to furnish a defense is broader than its obligation to indemnify."). By contrast, the duty to indemnify is narrower than the duty to defend, and "arises only if the claim for which the insured has been judged liable lies within the policy's coverage." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 83 (2d Cir. 2013) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 115 (2d Cir. 2005)). "An insurer's duty to defend claims made against its policyholder is ordinarily ascertained by comparing the allegations of a complaint with the wording of the insurance contract." *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004) (citations omitted); *see also Emps. Ins. Co. of Wausau v. Northfield Ins. Co.*, 150 F. Supp. 3d 196, 200 (E.D.N.Y. 2015) ("[T]he duty to defend 'is measured against the allegations of pleadings [of the underlying case.]'" (second alteration in original) (quoting

32

*Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014))).  "The duty [to defend] remains 'even though facts outside the four corners of [the] pleadings indicate that the claim may be meritless or not covered.'"  *Euchner-USA, Inc.*, 754 F.3d at 140 (alterations in original) (quoting *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006)). Under New York Law, an "insurer will be called upon to provide a defense whenever the allegations of the complaint 'suggest . . . a reasonable possibility of coverage.'"  *Euchner-USA, Inc.*, 754 F.3d at 141 (quoting *Auto Ins. Co. of Hartford*, 7 N.Y.3d at 137) (collecting cases).  "In order for an insurer to be relieved of the duty to defend, there must be 'no possible factual or legal basis on which an insurer's duty to indemnify under any provision of the policy could be held to attach.'"  *Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 252 (S.D.N.Y. 2013) (quoting *Century 21, Inc. v. Diamond State Ins. Co.,* 442 F.3d 79, 82–83 (2d Cir. 2006)); *see also Schlather, Stumbar, Parks & Salk, LLP v. One Beacon Ins. Co.*, No. 10-CV-167, 2011 WL 6756971, at *10 (N.D.N.Y. Dec. 22, 2011) ("[T]he duty to defend is 'measured against the possibility of recovery . . . .'" (quoting *Allianz Ins. Co.*, 416 F.3d at 115)).  Accordingly, an insurer may only be relieved of its duty to defend on the basis of a policy exclusion if it demonstrates:

> that the allegations of the complaint [in the underlying action] cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision.

*E. Ramapo Cent. Sch. Dist. v. N.Y. Sch. Ins. Reciprocal*, 54 N.Y.S.3d 413, 418 (App. Div. 2017) (alteration in original) (citations omitted); *see also Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 650 F. App'x 70, 71 (2d Cir. 2016) ("When an insurance contract contains an exclusion provision, the insurer generally bears the burden of proving that the claim falls within the scope

33

of an exclusion by establishing that 'the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'" (quoting *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115–16 (2d Cir. 1995))). If, however, there is even a "reasonable possibility of coverage," the insurer "will be called upon to provide a defense . . . ." *Euchner-USA, Inc.*, 754 F.3d at 141 (quoting *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137).

Defendant does not dispute that the Umana Claim arises from the Accident and the Umana Lawsuit is covered under the Policy. (Def.'s 56.1 Resp. ¶¶ 17–18; *see* Policy 4 ("Under Section I, we will pay damages which an insured becomes legally obligated to pay because of: 1. bodily injury sustained by a person; and 2. property damage arising out of the ownership, maintenance or use (including loading or unloading) of the owned auto or a non-owned auto." (emphasis omitted).) In addition, Defendant fails to discuss any exclusions that would have applied such that it would be excused from its contractual obligation to defend the Policyholder in any subsequent action. Defendant also fails to argue "no possible factual or legal basis on which an insurer's duty to indemnify . . . could be held to attach." *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 252. Despite the numerous pages of briefing dedicated to discussing the Disclaimer Letter, Defendant admittedly paid the policy limit to Umana and "is not relying on the disclaimer . . . in its Motion for Summary Judgment." (Def.'s Opp'n 2, 17–18; *see* Pl.'s Mem 8–16; Pl.'s Reply 3–4.) Therefore, the Umana Lawsuit triggered Defendant's duty to defend as the Accident was a covered occurrence under the Policy. (*See* Policy 4 ("We will defend any suit for damages payable under the terms of this policy even if the claim or suit is groundless.").) *See U.S. Specialty Ins. Co. v. Harleysville Worcester Ins. Co.*, No. 20-CV-7691, 2021 WL 4043457, at *10 (S.D.N.Y. Sep. 3, 2021) (finding where the insurer "has not established as a matter of law

34

that [ ] 'there is no possible factual or legal basis on which it might eventually be obligated to indemnify [the insured] under' the [ ] [p]olicy," the insurer had a duty to defend the insured in the underlying action (quoting *Allstate Ins. Co. v. Zuk*, 78 N.Y.2d 41, 45 (1991))); *WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.*, 549 F. Supp. 2d 555, 561–62 (S.D.N.Y. 2008) (finding New York case law and explicit terms of the policy provided a broad duty to defend that was triggered pursuant to the terms of the policy); *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, No. 86-CV-9671, 1992 WL 123144, at *7 (S.D.N.Y. May 27, 1992) ("[A]n insurer is obligated to defend if: (i) the alleged damage is potentially a covered loss under the policy and if, (ii) the alleged covered damage occurred during the policy period . . . . As such, [the insured] will be entitled to summary judgment on the duty to defend unless the insurers establish as a matter of law that property damage did not occur during the applicable policy periods or that the policy has no effect, e.g., because of a policy exclusion.").

As Defendant's duty to defend was triggered, the Court finds Defendant breached its duty by not providing a defense, resulting in the Policyholder incurring a default judgment against him. Defendant does not — and cannot — deny that it failed to defend the Policyholder in the Umana Lawsuit. *See Curry v. State Farm Fire & Cas. Co.*, No. 24-CV-1619, 2025 WL 1616627, at *3 (D. Conn. June 6, 2025) ("Where the insured defaults, the judgment creditor may sue the insurer for breach of contract for failing to defend the defaulted insured."); *XL Specialty Ins. Co. v. Lakian*, 243 F. Supp. 3d 434, 441 (S.D.N.Y. 2017) (concluding that insurer breached the insurance policy by failing to defend in the underlying action because "[d]efault is undeniably a failure to defend"). In fact, Defendant admits this in its opposition to Plaintiff Trustee's 56.1 Statement. (Def.'s 56.1 Resp. ¶¶ 47, 65, 68, 113, 121.)

### ii.   Defendant has not established any defense to excuse its breach of its duty to defend

Defendant has failed to establish that it is entitled to any of the following defenses which would excuse its breach of its duty to defend: (1) false reporting by the Policyholder; (2) the Policyholder's failure to comply with the Policy's notice requirement; or (3) non-cooperation by the Policyholder.

### 1.   Waiver of false reporting defense

Under New York law, an insurer can waive coverage defenses when it disclaims coverage on different grounds.[20]   "[A]n insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." *Lauder v. First Unum Life Ins. Co*, 284 F.3d 375, 382 (2d Cir. 2002) (alteration in

---

[20]   Under New York law, an insurer can also waive coverage defenses when it untimely disclaims coverage. *NGM Ins. Co. v. Blakely Pumping, Inc.*, 593 F.3d 150, 153 (2d Cir. 2010) ("If the insurance carrier fails to disclaim coverage in a timely manner, it is precluded from later successfully disclaiming coverage." (citing *Hartford Ins. Co. v. County of Nassau*, 46 N.Y.2d 1028, 1029 (1979))); *Webster ex rel. Webster v. Mount Vernon Fire Ins. Co.*, 368 F.3d 209, 215 (2d Cir. 2004) ("Once the insurer became obligated to disclaim within a reasonable time, its failure to do so estopped it from later denying coverage, even though the insurer would have otherwise been entitled to deny coverage based on the insured's failure to give timely notice."); *Travelers Indem. Co. v. Northrop Grumman Corp.*, 413 F. Supp. 3d 263, 279 (S.D.N.Y. 2019) (If an insurer fails to "make a timely disclaimer of coverage," "it is precluded from later successfully disclaiming coverage." (quoting *NMG Ins. Co.*, 593 F.3d at 153)); *Max Specialty Ins. Co. v. WSG Invs., LLC*, No. 09-CV-5237, 2012 WL 3150577, at *2 (E.D.N.Y. Aug. 2, 2012) ("An insurance company that fails to disclaim liability in a timely fashion waives the right to deny coverage based on an exclusion." (citing *Hartford Ins. Co.*, 46 N.Y.2d at 1029)).

   Defendant does not rely on the Disclaimer Letter it issued in April of 2019. (Def.'s Opp'n 2, 17–18.)  While this could implicitly mean it admits the Disclaimer Letter was untimely and thus ineffective and unenforceable, it is unclear to the Court whether the reasoning in the ROR, which was timely made, and the Disclaimer Letter are the same or different.  However, as explained below, both lack of cooperation and untimely notice defenses fail, therefore, the Court need not address this discrepancy to determine whether Defendant waived any defense by untimely disclaiming coverage, nor address whether the Disclaimer Letter was untimely or lacked the required specificity.

original) (quoting *New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991)); *see AMRO Realty Corp.*, 936 F.2d at 1431 (collecting cases); *see also Dataflow, Inc. v. Peerless Ins. Co.*, No. 11-CV-1127, 2014 WL 4881534, at * 9 (N.D.N.Y. Sep. 30, 2014) ("New York courts have found that an insurer's failure to raise procedural defenses in its denial of coverage letter constitutes a waiver of those defenses in subsequent litigation."); *Gen. Accident Ins. Grp. v. Cirucci*, 46 N.Y.2d 862, 864 (1979) (per curiam) ("Although . . . a disclaimer might have been premised on [a certain ground], since this ground was not raised in the letter of disclaimer, it may not be asserted now.").

Defendant contends it "initially disclaimed liability to the [P]olicyholder due to the lack of cooperation." (Def.'s Mem. 7.)  The ROR explicitly states Defendant made the reservation of rights because of a "failure to cooperate in the investigation of this loss." (ROR.)  In comparison, the Disclaimer Letter sent on April 16, 2019 disclaimed and denied coverage because "you: failed to provide [Defendant] with timely notice of the [Umana Lawsuit]." (A Log at GE 257-58).  It is unclear whether Defendant's use of "failure to cooperate" means failure to provide timely notice, and if failure to provide timely notice means "failure to cooperate," and the briefing is silent on this issue.[21]  What is clear is that Defendant never disclaimed or denied coverage based on the "false reporting" it now claims precludes judgment because the Policy required prompt written notice of the "details of the occurrence" which the Insured failed to abide by when they reported only physical damage to the car, and the report "was grossly incomplete, and thoroughly misleading," and therefore, the Insured "was in breach of the policy contract at the outset." (Def.'s Opp'n 12–13; Def.'s Reply 4–5.)

---

[21] *See supra* n.20.

Plaintiff Trustee correctly argues that Defendant's claim about false reporting of the Accident has no estoppel effect because it "did not purport to disclaim because of any purported false report but because of an alleged failure to provide notice of the lawsuit."  (Pl.'s Reply 2.) In support, Plaintiff Trustee argues that Defendant had sufficient knowledge of the otherwise "incomplete" report by the Policyholder when it received notice of claim and the no-fault benefits application by Umana's attorney in July of 2016, many months before it sent the ROR and Disclaimer Letter.  Thus, Defendant waived this defense when it failed to assert it in the ROR or the Disclaimer Letter.  *See Luria Bros. & Co. v. All. Assur. Co.*, 780 F.2d 1082, 1090–91 (2d Cir. 1986) (holding insurance company waived the nondisclosure defense by their original denial on other grounds because it knew of the vessel's extensive damages from the fire despite the lack of seaworthy condition report by the insured); *Middle E. Eng'g & Dev. Co. v. Arkwright-Boston Mfrs. Mut. Ins. Co.*, No. 86-CV-834, 1987 WL 17419, at *4 (S.D.N.Y. Sep. 16, 1987) (finding defendant "waived the affirmative defense of misrepresentation by not asserting it as a ground for disclaiming insurance coverage"); *see also AMRO Realty Corp.*, 936 F.2d at 1431–33 (finding insurance company waived a defense when it asserted several other grounds for disclaiming coverage, without asserting that defense).

### 2. Defendant was not prejudiced by the Insured's failure to comply with the Policy's notice provision

"New York law holds that 'an insured's failure to comply with a policy's notice provision violates a condition precedent to coverage, and relieves an insurer of an obligation to defend or indemnify the insured.'"  *105 St. Assocs., LLC v. Greenwich Ins. Co.*, 507 F. Supp. 2d 377, 380–81 (S.D.N.Y. Sep. 5, 2007) (quoting *Nouveau Elevator Indus., Inc. v. Cont'l Cas. Ins. Co.*, No. 05-CV-813, 2006 WL 1720429, at *3 (E.D.N.Y. June 21, 2006)); *see Com. Union Ins. Co. v. Int'l Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir. 1987) (finding that "under New

38

York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy"). "A provision that notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the insurer in this state, with particulars sufficient to identify the insured, shall be deemed notice to the insurer." N.Y. Ins. Law § 3420(a)(3). "[A]n insurer may not deny coverage based on untimely notice unless the untimely notice prejudiced the insurer." *Travelers Indem. Co. v. Patino*, No. 21-CV-2510, 2022 WL 3701506, at *2 (S.D.N.Y. Aug. 26, 2022); N.Y. Ins. Law § 3420(a)(5) ("A provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide timely notice has prejudiced the insurer . . . ."); *see Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*, 752 F. App'x 90, 93–94 (2d Cir. 2019) ("Even if the notice had been late or inadequate, [the defendant's] defense would require a showing that it was prejudiced."); *Am. Transit Ins. Co. v. Hashim*, 892 N.Y.S.2d 78, 79 (App. Div. 2009) ("Having received timely notice of claim, [an] insurer [is] not entitled to disclaim coverage based on untimely notice of the claimant's commencement of litigation unless it was prejudiced by the late notice.").

New York Insurance Law § 3420(c)(2)(C) establishes that "[t]he insurer's rights shall not be deemed prejudiced unless the failure to timely provide notice materially impairs the ability of the insurer to investigate or defend the claim." *Id.*; *Harleysville Worcester Ins. Co.*, 752 F. App'x at 94 (quoting *id.*); *Travelers Prop. Cas. Ins. Co. of Am. v. Hudson Excess Ins. Co.*, No. 23-CV-3249, 2025 WL 2782857, at *9 (S.D.N.Y. Sep. 30, 2025) (quoting same). New York Insurance Law § 3420(c)(2)(B) establishes that "an irrebuttable presumption of prejudice shall apply if, prior to notice, the insured's liability has been determined by a court of competent jurisdiction."

39

*Id.*; *Patino*, 2022 WL 3701506, at *2 (quoting *id.*); *see Allstate Indem. Co. v. Progressive Cas. Ins. Co.*, No. 20-CV-2800, 2022 WL 4472283, at *4 (E.D.N.Y. Sep. 2, 2022) ("Section (c)(2)(B) creates an irrebuttable presumption of prejudice where the insured's liability had been determined prior to notice precisely because doing so always materially impairs the ability of the not-noticed insurer to defend the claim."), *report and recommendation adopted*, 2022 WL 4468378 (E.D.N.Y. Sep. 26, 2022).  New York courts have held that an insurer was not entitled to an irrebuttable presumption of prejudice, and ultimately was not prejudiced, where it was notified before a default judgment was entered against the insured.  *See Hashim*, 892 N.Y.S.2d at 79–80 (finding insurer failed to demonstrate prejudice by reason of late notice of the underlying action where it "was notified of the legal action after the motion for a default judgment was made, but before the . . . order scheduling an inquest" because "[i]t could have appeared, opposed the motion, and filed for leave to file a late answer, but pursued none of those options."); *Am. Transit Ins. Co. v. B.O. Astra Mgmt. Corp.*, 835 N.Y.S.2d 106, 106 (App. Div. 2007) (concluding that insurer was not prejudiced by late notice); *see also Harleysville Worcester Ins. Co.*, 752 F. App'x at 94 (An insurer's "generalized assertion of prejudice" that "it was prejudiced by the late notice because it was deprived of the opportunity to participate in phases of the litigation . . . including discovery and summary judgment briefing" was "insufficient to establish" it was "materially impair[ed]" in its ability to defend [the insured]." (first alteration in original) (internal quotation marks and citation omitted)); *cf. Patino*, 2022 WL 3701506, at *4 (finding where insurer "was not notified of the [u]nderlying [a]ction until after default judgment had been entered . . . [was] entitled to an irrebuttable presumption of prejudice"); *Villavicenio v. Erie Ins. Co.*, 101 N.Y.S.3d 361, 363 (App. Div. 2019) (concluding

that because "the liability of [the property owner] has been determined by a court of competent jurisdiction, and [defendant] is entitled to an irrebuttable presumption of prejudice").

Although Defendant does not specifically argue in its motion for summary judgment that it is entitled to an untimely notice defense to its breach of its duty to defend, Plaintiff Trustee and Defendant spend an enormous number of words on the issue of when the Policyholder sent the summons to Defendant. (Def.'s Opp'n 14–17; Pl.'s Reply 5–7; Def.'s Mem. 13–15, 16–19; Def.'s Reply 5–6.) While there exists a genuine factual dispute as to when Defendant received the summons from the Policyholder, what is not in dispute is: (1) the Policyholder called Defendant to report the Accident and resulting physical damage on the day of the Accident; (2) Defendant received Umana's no-fault benefits application, the Umana Claim, five days after the accident; (3) Umana's counsel informed Defendant about the Umana Lawsuit on April 14, 2017, a date after Umana filed a motion for default on March 7, 2017, but before the court granted the motion for default on April 19, 2017; Umana moved for entry of default on June 13, 2017, the court held an inquest on August 21, 2018, and the court entered a default judgment on January 7, 2019; and (4) Defendant offered to pay in August of 2016 and paid Umana on May 20, 2019 the full amount covered under the Policy. Thus, Defendant was not prejudiced by the constructive notice of the lawsuit it received by Umana's lawyer, nor prejudiced by the actual notice of the lawsuit it argues it first received from the Insured in October of 2018. *See Trumbull Equities LLC. v. Mt Hawley Ins. Co.*, 129 N.Y.S.3d 663, 663 (Sup. Ct. 2020) (granting summary judgment where insurer received notice of the action from outside counsel and sent insured a copy of a letter referencing the underlying action finding that "while there may have been late notice of the litigation," the insured was "not entitled to disclaim coverage based on untimely

notice of the action unless it was prejudiced by the late notice" — something the insured failed to do).

It is no excuse that: (1) Defendant did not ask PM Legal Investigations to obtain the summons and complaint; (2) Defendant was unable to get the docket number of the Umana Lawsuit through the various conversations it had with Umana's attorney, the Insured's criminal attorney, and the Policyholder; and (3) Defendant's claims adjuster was unable find the case on a public database when she finally searched on June 13 or September 18, 2018, respectively a year and year and a half after receiving notice of the Umana Lawsuit, while other employees were able to find it quickly at a later point in time.

Defendant was on notice that a personal injury lawsuit was forthcoming when it initially received the claim in July of 2016, especially given the severity of Umana's injuries, and when it discussed the claim with Umana's attorney throughout 2016 and 2017.  In addition, when Defendant allegedly received the summons in early October of 2018, there was still time to move the court in the Umana Lawsuit to vacate the default as the court had not yet entered the default judgment.  To the extent the ROR sent on July 26, 2016 was contemplated to include an untimely notice reasoning, Defendant has failed to establish it was prejudiced by the alleged untimely notice by the Insured and thus is not entitled to be relieved of its contractual duty to defend or excused of its breach of that duty under a theory of late notice by the Policyholder.

### 3.   Defendant has failed to establish a non-cooperation defense

Under New York Law, the failure of an insured to cooperate with the insurer's investigation of a claim and/or defense of an action is a breach of the policy and can bar recovery.  *See Roc Nation LLC v. HCC Int'l Ins. Co.*, 523 F. Supp. 3d 539, 555 (S.D.N.Y. 2021) ("[T]he failure of an insured to cooperate with the insurer in its investigation of a claim

constitutes a material breach of the contract of insurance, and is a defense to a suit by the insured on the policy." (quoting *Evans v. Int'l Ins. Co.*, 562 N.Y.S.2d 692, 694 (App. Div. 1990))); *Empire Fire and Marine Ins. Co. v. Estrella*, No. 18-CV-3422, 2019 WL 6390193, at \*5 (E.D.N.Y. Sep. 13, 2019) ("Under New York law, the insured's failure to cooperate with the insurer in the defense of an action is a breach of a condition precedent under the policy, which bars recovery under it."). "[A]n insurer invoking this defense faces a 'very heavy burden.'" *Roc Nation LLC*, 523 F. Supp. 3d at 555 (quoting *N.Y. Cent. Mut. Fire Ins. Co. v. Salomon*, 782 N.Y.S.2d 730, 732 (App. Div. 2004)). "In order to disclaim coverage on the ground of an insured's lack of cooperation, the carrier must demonstrate (1) that it acted diligently in seeking to bring about the insured's cooperation, (2) that the efforts employed by the insurer were reasonably calculated to obtain the insured's cooperation, and (3) that the attitude of the insured, after his cooperation was sought, was one of willful and avowed obstruction." *N.Y.C. Hous. Auth. v. Hous. Auth. Risk Retention Grp., Inc.*, 203 F.3d 145, 151 (2d Cir. 2000) (quoting *Pawtucket Mut. Ins. Co. v.* Soler, 584 N.Y.S.2d 192, 193 (App. Div. 1992) (citing *Thrasher v. U.S. Liab. Ins. Co.*, 278 N.Y.S.2d 793, 800 (1967))).

As Plaintiff Trustee correctly argues, Defendant has failed to make any showings to meet its "heavy burden" to establish a failure of the Insured to cooperate with its investigation of the claim and/or defense to the underlying action. (Pl.'s Opp'n 15–16.) Defendant's briefing is replete with allegations of the Insured's failure to return its phone calls, to send the summons and complaint, and to otherwise provide the information it sought. (Def.'s Mem. 2, 4–7, 13–15; Def.'s Opp'n 4–7, 11, 14–16, 17; Def.'s Reply 6–7.) While the Court can view these facts as an effort to demonstrate the first element — that it "acted diligently in seeking to bring about the Insured's cooperation" — Defendant has failed to address the second element — that the efforts

43

it undertook "were reasonably calculated to obtain the Insured's cooperation" — or the third element – that the attitude of the Policyholder was "one of willful and avowed obstruction" — thus failing to establish a lack of cooperation defense.  Defendant fails to make this argument in its motion for summary judgment, and the Court therefore does not need to address this defense further.

### iii. Plaintiff Trustee may recover the full default judgment of the Umana Lawsuit as consequential damages but there exists a genuine dispute of material fact that precludes a finding that Defendant breached its duty to defend in bad faith

### 1. Alleged causation requirements

Plaintiff Trustee argues the case law Defendant relies upon is outdated and has been subsequently overruled, and there is no causation requirement that Plaintiff Trustee needs to satisfy.  (Pl.'s Reply 1–2; Pl.'s Opp'n 9, 11.)   In addition, Plaintiff Trustee contends that he need not demonstrate an "opportunity to settle" because the instant action "was never about a 'failure to settle,' but was primarily about [Defendant]'s failure to defend [the Umana Lawsuit] on the merits and allowing a default judgment to be incurred against the insureds."  (Pl.'s Opp'n 6.)

Defendant argues that Plaintiff Trustee has failed to satisfy black-letter law causation requirements for obtaining extra-contractual damages for bad faith arising from the alleged failure of an insurer to defend its insured by offering no evidence that Haniff had a meritorious defense in the civil litigation nor that he lost an actual opportunity to settle within limits.[22] (Def.'s Mem. 8–12; Def.'s Opp'n 1, 7–10, 20; Def.'s Reply 2–4.)

---

[22] Defendant argues, quoting *U.S. Fidelity & Guaranty Co. v. Copfer*, 48 N.Y.2d 871, 873 (1979), that Plaintiff Trustee offers "no evidence that 'the insured lost an actual opportunity to settle' the [Umama Litigation] 'within the coverage limits'" and thus has failed to satisfy "black-letter causation requirements."  (Def.'s Mem. 8; Def.'s Opp'n 7–8.)  *See also Brennan v. Mead*, 438 N.Y.S.2d 821, 823 (App. Div. 1981) (finding "[p]laintiffs' claim for damages resulting from the insurer's 'bad faith' must be rejected . . . 'since there was no showing

Defendant's sole case supporting its argument that Plaintiff Trustee need to demonstrate the Umana Lawsuit could have been successfully defended, is the New York Court of Appeals decision in *K2 Investment Group, LLC v. American Guarantee & Liability Insurance Co.*, 21 N.Y.3d 384 (2013), which was later vacated, 22 N.Y.3d 578 (2014). This case involved claims for legal malpractice brought against American Guarantee's insured which American Guarantee conceded it "wrongly . . . refused to defend." *K2*, 22 N.Y.3d at 584. In *K2*, the insured suffered

---

whatsoever that the insured lost an actual opportunity to settle the negligence claim against him within the coverage limits of his policy by reason of the insurer's purported "bad faith"'" (quoting *Copfer*, 48 N.Y.2d at 873)). Defendant's reliance on these cases is inappropriate. Although a cursory read of the *Copfer* opinion states the quoted language, ("The insured's claim for additional damages resulting from the insurer's alleged 'bad faith' must be rejected, however, since there was no showing whatsoever that the insured lost an actual opportunity to settle the negligence claim against him within the coverage limits of his policy by reason of the insurer's purported 'bad faith.'"), a review of the Appellate Division's opinion explains that in 1978, the principle that a showing of bad faith to justify awards in excess of a policy "ha[d] been applied solely to bad-faith failure to settle, not to breach of the obligation to defend." *U.S. Fid. & Guar. Co. v. Copfer*, 406 N.Y.S.2d 201 (App. Div. 1978). This is no longer accurate. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 2522 F.3d 608, 624–25 (2d Cir. 2001) (finding an insurance company that was found to be in bad faith refusing to defend could be held liable for damages arising from the underlying action in excess of the policy limit); *Scottsdale Ins. Co. v. McGrath*, 549 F. Supp. 3d 334, 353 (S.D.N.Y. 2021) ("In a third-party context, the well-developed body of law regarding bad faith refusal to defend, settle, or indemnify provides guideposts to courts an contracting parties regarding when a party is entitled to damages in excess of policy limits . . ..").

While the issue of consequential damages in excess of policy limits arises in failure to settle claims, as insurers can settle above policy limits forcing the insureds to be responsible for the rest of the settlement, this case is not about a claimed failure to settle and thus any alleged requirement that Plaintiff Trustee make a showing that Defendant could have settled within policy limits is unwarranted.

Further, these cases predate *Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187 (2008) and *Panasia Estates, Inc. v. Hudson Insurance Co.*, 10 N.Y.3d 200 (2008), which established that "consequential damages resulting from a breach of the covenant of good faith and fair dealing may be asserted in an insurance contract context, so long as the damages were "within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Panasia Ests.*, 10 N.Y.3d at 203 (quoting *Bi-Economy*, 10 N.Y.3d at 192–93). The i case before the Court is premised on Defendant's failure to defend, and the question of whether Plaintiff Trustee can recover an award in excess of the policy limit based on Defendant's alleged bad faith failure to defend in breach of the Policy has been established and supported in the Second Circuit. *See infra* Section II.B.iii.2 for further discussion.

a default judgment and then assigned his rights against the insurance company to plaintiffs who sought "to enforce American Guarantee's duty to indemnify [the insured] for the judgment." *Id.* American Guarantee asserted that the loss was not covered, relying on two exclusions in the policy, thus disclaiming both its duty to defend and its duty to indemnify. *Id.*; see *K Inv. Grp., LLC v. Am. Guar. & Liab. Ins. Co.*, 936 N.Y.S.2d 139, 402 (App. Div. 2012). Defendant quotes the court's opinion in *K2* in support of its argument that: "[A claim for damages in excess of policy limits] would require the insured to show, at a minimum, that the judgment against him would not have been entered if the insurer had defended the case." *K2*, 21 N.Y.3d at 392. (Def.'s Mem. 10–11.) To show this to be true, "[plaintiffs] would face an awkward task in making that case: it would require them to prove that the judgment against [the insured] that they obtained by default could not have been obtained if [the insured] had been defended." *K2*, 21 N.Y.3d at 392.

The Court reads the quoted language not as creating a requirement that an insured "had a viable defense," but as explaining that the plaintiff faced the "awkward task" of proving that the default judgment would not have been obtained if the insured was defended. *Id.* (Def.'s Mem. 9–11.) Proving default judgment would not have been entered is very different from proving the insured "had a viable defense" to the entire lawsuit, as Defendant claims. Regardless, the Court cannot find any case law, either in New York state or federally in the Second Circuit, that holds that a plaintiff is required to establish either that a viable defense must have existed or that default would not have been entered if the insured was defended in order for an insured to recover extra-contractual damages in a bad faith action for failure to defend. No case has relied upon *K2*'s dicta and the holding was later vacated, thus it has no precedential effect.

In fact, the Court of Appeals in *K2* explicitly held that it "need not decide . . . whether [an alleged failure to defend] could ever support a claim for damages in excess of policy limits," 21 N.Y.3d at 392.  Therefore, there is no case law for the Court to apply.  Instead, the *K2* language that Defendant quotes comes from a portion of the opinion that discusses the insurance company's alleged bad faith failure to settle or defend, implying this is not a separate requirement.  *Id.*  Further, the Court of Appeals later decision vacating its previous *K2* decision, the source of this dictum, decided only the issue of the insurance company being "barred from relying on policy exclusions as a defense to this lawsuit [for indemnification]," not on the issue of bad faith.  *K2*, 22 N.Y.3d at 587.

Further, *K2* is distinguishable from the present situation for several reasons: (1) *K2* involved an insurance company that repudiated its duty to defend and its duty to indemnify, which it later conceded was wrongly done; Defendant in this case does not claim to have disclaimed its duty to defend but, Defendant similarly concedes that it failed to defend the Insured; (2) plaintiffs in *K2* did not allege that the judgment obtained by default "could not have been obtained if [the insured] had been defended," 21 N.Y.3d at 392; in this case, Plaintiff Trustee has; and (3) plaintiffs in *K2* sought to "enforce American Guarantee's duty to indemnify [the insured] for the judgment" while American Guarantee asserted that the loss was not covered, relying on two exclusions in the policy, 22 N.Y.3d at 584; Plaintiff Trustee in this case alleges breach of contract and seeks to recover extra-contractual damages which Defendant argues he cannot because of a failure to show bad faith.  Accordingly, the Court refuses to construe this dicta as creating a "black-letter law requirement" and subsequently enforce that requirement, forcing Plaintiff Trustee to demonstrate that the Umana Lawsuit could have been successfully

47

defended, based on a vacated opinion's dicta that has not been cited to or further enforced in the almost thirteen years since it was published.  (Def.'s Mem. 12.)

### 2.    Consequential damages in excess of the Policy's limits

Plaintiff Trustee argues he is entitled to consequential damages arising out of Defendant's breach of its duty to defend, even if such damages exceed the insurance policy limit.  (Pl.'s Mem. 16–17.)  In support, Plaintiff Trustee contends that New York case law holds that "when an insurer breaches the insurance contract, an insured unequivocally may recover consequential damages in excess of policy coverage" "resulting from a breach of the covenant of good faith and fair dealing" because the damages were "within the contemplation of the parties as the probable result of a breach at the time of or prior to contract."  (Pl.'s Opp'n 7 (first citing *Bi-Economy Mkt. Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187 (2008); and then quoting *Panasia Ests., Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 193 (2008).)  In addition, Plaintiff Trustee argues that his claim satisfies the requirements for consequential damages arising out of a breach of contract claim because "[t]he default judgment, as was the bankruptcy of [the Insured], was the natural and probable consequence of [Defendant's] breach of its duty to defend, and an imposition of a significant monetary judgment was foreseeable and reasonably contemplated by the parties as an expected result if the insurer breached its obligation."  (*Id.* at 7–11.)

Defendant contends that "[e]ven assuming *arguendo* that there was a breach, there is no proof of causally-related consequential damages, only [Plaintiff Trustee]'s speculation."  (Def.'s Opp'n 3.)  In addition, Defendant argues that Plaintiff Trustee fails to cite any case law "where a policyholder obtained summary judgment on a bad faith duty-to-defend claim — let alone a New York case where a policyholder obtained an excess verdict as an award on a duty-to-defend claim on summary judgment."  (Def.'s Opp'n 3, 12–13; Def.'s Mem. 12–19.)

"[A] plaintiff may seek two distinct categories of damages" in a breach of contract case: "(1) general or market damages; and (2) special or consequential damages." *Rensselaer Polytechnic Inst. v. Varian, Inc.*, 340 F. App'x 747, 750 (2d Cir. 2009) (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000)). "A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised,'" whereas consequential damages "compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld*, 218 F.3d at 175–76 (quoting 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.2(3) (1993)); *see also Keystone Foods Holding Ltd. v. Tyson Foods, Inc.*, No. 22-1113, 2023 WL 3477157, at *1 (2d Cir. May 16, 2023) ("'Special' — or, alternatively, 'consequential' — damages seek to compensate a plaintiff for losses other than the value of the promised performance that are incurred as a result of the defendant's breach." (citing *Schonfeld*, 218 F.3d at 175)). General, or direct, damages "are usually expectation damages, measured 'by what it would take to put the [plaintiff] in the same position that it would be in had the [defendant] performed as promised under the contract.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quoting *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 151–52 (App. Div. 2012)); *see N. Am. Photon Infotech Ltd.*, 2024 WL 4799843, at *4 (quoting same).

Under New York law, a non-breaching party to a contract may recover consequential damages or "damages beyond those which naturally and directly flow from the breach only when 'such unusual or extraordinary damages [were] brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'" *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir. 2006) (alteration in original) (quoting *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 (1989)); *Harris v. Provident Life & Accident Ins. Co.*,

310 F.3d 73, 80 n.3 (2d Cir. 2002) (quoting same); *see Donohue v.* Cuomo, 980 F.3d 53, 75 (2d Cir. 2020) ("It is well settled that in breach of contract actions the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." (quoting *Bi-Economy*, 10 N.Y.3d at 192)); *Panasia Ests., Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203 (2008) ("[C]onsequential damages resulting from a breach of the covenant of good faith and fair dealing may be asserted in an insurance contract context, so long as [those] damages were 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'" (quoting *Bi-Economy*, 10 N.Y.3d at 192)); *see also Scheuer v. U.S. Liab. Ins. Co.*, No. 22-CV-9474, 2023 WL 4275114, at *3 (S.D.N.Y. June 27, 2023) (noting that the "three necessary elements to establish a claim for consequential damages arising out of a breach of contract claim" are that "(1) such consequential damages were a natural and probable consequence of the breach of contract, (2) were or should have been foreseeable, and (3) were reasonably contemplated by the contracting parties at the time the policy was issued" (quoting *Roman Cath. Diocese v. Gen. Reinsurance Corp.*, No. 16-CV-2063, 2016 WL 5793996, at *4 (S.D.N.Y. Sep. 23, 2016))). "[T]he party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made" and the breaching party need not "have foreseen the breach itself or the particular way the loss occurred, rather [i]t is only necessary that loss from a breach was foreseeable and probable." *Schlather, Stumbar, Parks & Salk, LLP*, 2011 WL 6756971, at *13 (alterations in original) (quoting *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 403 (1993)). "Once a breach of the covenant of good faith and fair dealing ha[s] been asserted [in an insurance contract context], the court must then 'determine whether consequential damages were reasonably contemplated by the parties,' by examining 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as

50

what liability the [insurer] fairly may be supposed to have assumed consciously, or to have warranted the [insured] reasonably to suppose that it assumed, when the contract was made.'" *Goldmark, Inc. v. Catlin Syndicate Ltd.*, No. 09-CV-3876, 2011 WL 743568, at *3 (E.D.N.Y. Feb. 24, 2011) (third and fourth alterations in original) (quoting *Bi-Economy*, 10 N.Y.3d at 193); *see Kruglov v. Copart of Ct., Inc.*, 771 F. App'x 117, 119 (2d. Cir. 2019) (quoting same); *MVP Health Plan, Inc. v. OptumInsight, Inc.*, 765 F. App'x 615, 618 (2d Cir. 2019) (quoting same); *Bi-Economy*, 10 N.Y.3d at 193 (quoting *Kenford*, 73 N.Y.2d at 319).

Finally, consequential damages "must be proven by the party seeking them," and the proof "cannot be speculative or conjectural." *Bi-Economy*, 10 N.Y.3d at 193; *see also Jill Stuart (Asia) LLC v. Sanei Int'l Co.*, 566 F. App'x 29, 32 (2d Cir. 2014) ("[P]roof of consequential damages cannot be speculative or conjectural." (alteration in original) (quoting *Bi-Economy*, 10 N.Y.3d at 193)).

Plaintiff Trustee cites to several cases in support of his argument that he is entitled to consequential damages arising from Defendant's failure to defend — but each case suffers from either: (1) being distinct from the situation before the Court because that case did not involve a complete and utter failure to defend that resulted in the entry of a default judgment (instead deals with allegations of failures to settle, failures to adequately defend, or failures to pay or indemnify

51

claims and/or litigation costs)[23]; or (2) lacks precedential effect because the case does not apply New York law and instead applies case law from outside the Second Circuit.[24]

As Defendant argues, Plaintiff Trustee fails to cite case law in the Second Circuit or New York where a court *awarded* consequential damages in excess of the policy limit in the situation where an insurer breached their duty to defend the insured resulting in a default judgment, but Defendant also fails to cite case law in the Second Circuit or New York where a court *denied* such consequential damages and limited the insured's recovery to the policy limits. Insurance treatises in New York similarly are silent on this issue. The New York Practice Series on New York Insurance Law comes closest by generally stating "[a]n insurer may be liable for consequential damages resulting from the wrongful failure to defend, such as damage to the insured's credit rating, costs incurred to vacate a default judgment, and attorneys fees to defend a declaratory judgment action by the insurer . . . ." 31 Anne M. Payne & Joseph Wilson, N.Y. Prac., New York Ins. L. § 31:39 (2024–2025 ed.). *Williams v. Associated Mut. Ins. Co.*, 621

---

[23] *See Schlather, Stumbar, Parks & Salk, LLP v. One Beacon Ins. Co.*, No. 10-CV-167, 2011 WL 222235, at *2 (N.D.N.Y. Jan. 21, 2011) (involving a failure to defend where plaintiffs suffered, as a result, the "incursion of defense costs; loss of peace of mind and related security, financial and otherwise; and other consequential damages"); *see also Gov. Empls. Ins. Co. v. Saco*, No. 12-CV-5633, 15-CV-634, 2020 WL 3414531 (E.D.N.Y. June 22, 2020) (involving an allegation of failing to settle in good faith); *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451 (2005) (involving a primary and excess insurer where primary insurer refused to defend, and excess insurer sued to recover expenses); *Gruenspecht v. Balboa Ins. Co.*, 93 A.D.3d 482 (App. Div. 2012) (involving claim for failure to adjust and pay plaintiff's insurance claim in a timely and good-faith manner).

[24] *See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 901–02 (9th Cir. 2000) (summarizing "long-settled" California law that where "[w]hen an insurer refuses to defend and the insured does not employ counsel and presents no defense, it can be said the ensuing default judgment is proximately caused by the insurer's breach of the duty to defend" and thus the insurer can recover the full judgement as consequential damages (citations omitted)); *Amato v. Mercury Cas. Co.*, 53 Cal. App. 4th 825, 831–39 (Cal. Ct. App. 1997) (same); *see also McGrath v. Everest Nat. Ins. Co.*, 668 F. Supp. 2d 1085, 1107–08 (N.D. Ind. 2009) (applying Indiana state law, although similar to N.Y. state law)

52

N.Y.S.2d 206 (App. Div. 1995) is the most analogous case, where an insured brought suit against his insurer after it failed to timely defend the insured in an underlying tort action which resulted in a default judgment against plaintiff. *Id.* at 207–08. The insurer later retained counsel to vacate the default judgment, and the insurer ultimately negotiated and paid the settlement. *Id*. at 207. The insurer conceded it owed a duty to defend the insured, and the court held the plaintiff could recover "special or extraordinary damages" in the breach of contract action "upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made." *Id.* at 208. The court found plaintiff's "claim for counsel fees incurred by plaintiff in his direct effort to vacate the default judgment entered as a result of [the insurer's] failure to defend plaintiff" in the underlying action was proven and therefore recoverable as consequential damages. *Id.*

Generally in most states, and as cited in federal treatises, an insurer will be responsible for consequential damages arising out of its breach of its duty to defend,[25] which "may include the full value, potentially, of the judgment entered against the insured, which could exceed policy limits." 1 Steven Plitt & Jordan Ross Plitt, Practical Tools for Handling Insurance Cases § 2:16 (2025); *see* 1 Allan D. Windt., Ins. Claims and Disputes § 4:36 (6th ed. 2025) ("[A]n insurer may be liable for any default judgment that is entered against the insured, even if it is in excess of the policy limits" "if an insurer, either through inaction or affirmative representations, leads an insured to believe that it will provide a defense, but fails to do so," because that "default

---

[25] The treatise also notes that "[a] majority of courts have limited such damages to the policy limits where the breach of the duty to defend was not in bad faith," that is to say, a majority of courts do not limit damages for breach of duty to defend when the breach was found to be in bad faith. 1 Steven Plitt & Jordan Ross, Practical Tools for Handling Insurance Cases § 2:16 n.20 (2025). New York is one of those states, as explained *infra* Section II.B.iii.3. Therefore, as explained below, Plaintiff Trustee must still prove Defendant's breach was in bad faith to recover the full amount of the default judgment as consequential damages.

judgment would . . . represent the insured's consequential damages resulting from the carrier's breach of its duty of good faith and fair dealing."); *see also McGrath v. Everest Nat. Ins. Co.*, 668 F. Supp. 2d 1085, 1107–08 (N.D. Ind. 2009) (collecting cases from the Fifth Circuit and the Ninth Circuit, as well as from Georgia, Kansas, California, North Carolina, and Indiana state courts).

As supported by federal treatises and case law from across the United States, the Court finds the default judgment incurred against the Insured in the Umana Lawsuit was the natural, probable, and foreseeable consequence of Defendant's complete and utter failure to defend the Insured, and was reasonably contemplated by the parties when the Policy was entered into with the understanding that Defendant had an obligation to defend the Insured unless it timely disclaimed coverage and timely notified the Insured of that disclaimer. *See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 902–03 (9th Cir. 2000) (holding that an insurer, who's breach of its duty to defend resulted in a default judgment, was liable to the insured for the full amount of the default judgment); *Liberty Mut. Fire Ins. Co. v. Canal Ins. Co.*, 177 F.3d 32, 337 (5th Cir. 1999) (finding "if the insurer leads the insured to believe he will provide a defense, but does not, the insurer may be liable for a default judgment entered in excess of the policy limits"); *Fid. & Cas. Co. of N.Y. v. Gault*, 196 F.2d 329, 330 (5th Cir. 1952) (concluding that an insurer that undertakes the defense or investigation of a claim but breaches its duty is liable for all damages resulting); *McGrath*, 668 F. Supp. 2d at 1115, 1119 (finding the insured entitled to the full judgment entered into by the state court upon default judgment where the insurer breached its duty to defend); *Reshamwalla v. State Farm Fire and Cas. Co.,* 112 F. Supp. 2d 1010, 1022 (E.D. Cal. 2000) (holding that where an insurer breaches its duty to defend and the insured suffers a default judgment, "the insurer is liable on the judgment, even if it is in

54

excess of policy limits"); *see also Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 274 Ga. App. 738, 750 (Ga. Ct. App. 2005) (finding the party that breached its duty resulting in a default judgment was liable for the full amount of the default judgment, plus interest and costs); *Johnson v. Westhoff Sand Co.,* 31 Kan.App.2d 259 (Kan. Ct. App. 2003) (holding the insurer's wrongful failure to provide a defense, which resulted in the entry of a default judgment, obligated the insurer to pay the full amount of the judgment in excess of the policy limits); *Tradewinds Escrow, Inc. v. Truck Ins. Exch.,* 97 Cal. App. 4th 704, 713 n.6 (Cal. Ct. App. 2002) (finding that as "default judgments are recoverable without a showing of indemnity," "[w]here the insured is financially unable to mitigate damages from the breach of the duty to defend by hiring its own counsel, a default judgment is considered a consequential damage of the breach of the duty [to defend]"); *Naddeo v. Allstate Ins. Co.,* 139 N.C. App. 311, 318–21 (N.C. Ct. App. 2000) (holding that the insurer had a duty to defend under the policy, and thus was liable to the insured for the full amount of the default judgment that resulted from its breach).  For the reasons discussed, Plaintiff Trustee may recover consequential damages in excess of the Policy limits, provided that he can prove the Defendant breached its duty to defend in bad faith.

### 3.  Bad Faith

Plaintiff Trustee argues that Defendant acted in bad faith[26] and acted in "gross disregard against the interests of the [I]nsured," when it failed to assign counsel to defend the Insured in

---

[26]  In its opposition to Defendant's motion for summary judgment, Plaintiff Trustee attempts to argue that there is "no requirement that the insured establish the insurer's bad faith or a gross disregard" to recover consequential damages, and further argues that this is supported by *Schlather, Stumbar, Parks & Salk, LLP*, 2011 WL 222235. (Pl.'s Opp'n 8.)  As explained *infra*, and as pointed out by Defendant, (Def.'s Reply 6–7), this is inaccurate and not supported by Second Circuit or New York case law.  *See Goldmark, Inc. v. Catlin Syndicate Ltd*, No. 09-CV-

the Umana Litigation.  (Pl.'s Mem. 20–21.)  In addition, Plaintiff Trustee alleges that "Defendant's bad faith was further exacerbated by [its] egregious conduct throughout the handling of the Umana [C]laim."  (*Id.* at 21–25.)  These additional acts include: (1) engaging "in a deceptive and misleading course of action lying to the [I]nsureds making material misrepresentations regarding [Defendant]'s handing of the matter," specifically in regards to the May 25, 2017 and November 16, 2017 letters, (*id.* at 21); (2) engaging in a cover up to "construct a false narrative in order to disclaim when it became apparent . . . that the Umana [Lawsuit] was mishandled. . .," (*id.* at 22–24; Pl.'s Opp'n 23–25); (3) never admitting it had notice of the Umana Lawsuit when Mosley informed Defendant on multiple occasions and Defendant still took no action, (Pl.'s Mem. 21); (4) "fail[ing] to take any concrete steps [in all of 2017 and 2018] to obtain the summons other than to ask Umana's attorney . . . , leave a phone message for Ameer Haniff's criminal attorney . . . , and send a series of letters to one (of three) insured . . .," (Pl.'s Reply 10); (5) conducting an "inadequate" investigation as assigned to PM Legal Investigations, (Pl.'s Opp'n 21–23); and (6) relying on letters addressed not to the named Insured on the Policy and which did not "put[] the [I]nsureds on notice that Mosley said the summons and complaint was served and a default pending," (*id.* at 21).  In addition, Plaintiff Trustee argues that Defendant "does not demonstrate that the [I]nsureds evinced a willful or avowedly obstructionist attitude toward [Defendant's] inquiries."  (*Id.* at 22 (internal citation and

---

3876, 2011 WL 743568, at *3 (E.D.N.Y. Feb. 24, 2011) (finding cases in the Second Circuit "have virtually uniformly held that, after *Panasia Estates* and *Bi-Economy*, a plaintiff simply 'cannot sustain a claim for consequential damages without showing that defendants lacked good faith . . .'").  "To prevail on a claim for consequential damages under *Bi-Economy*, the insured must establish that the insurer breached the implied duty of good faith." *Woodworth v. Erie Ins. Co.*, 743 F. Supp. 2d 201, 216 n.13 (W.D.N.Y. 2010) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 396 (2d Cir. 2000)).

quotation marks omitted).)  Lastly, Plaintiff Trustee argues Defendant does not "establish as a matter of law that its breach and related actions were somehow made in good faith."[27]  (*Id.* at 1.)

Defendant argues that "[Plaintiff Trustee] cannot overcome the strong presumption against a finding of bad faith under New York law for a duty-to-defend-claim" and Plaintiff Trustee "does not acknowledge the high bar for bad faith in New York" and "comes nowhere near to meeting this high standard" that Defendant "grossly disregarded" the Insured's interests. (Def.'s Opp'n 2–3, 12–13; Def.'s Mem. 12–19.)  Specifically, Defendant contends that Plaintiff Trustee has presented "no evidence that [Defendant] deliberately or recklessly disregarded its obligation to defend the policyholder or exhibited a conscious or knowing indifference to her interests" given: (1) Defendant's repeated attempts to obtain the summons and complaint and to enlist the Insured's cooperation, (Def.'s Mem. 13–15); (2) it did not receive the summons and complaint from the Insured until over two years after she was served, (*id.* 16–17); (3) Plaintiff Trustee's false claim report to Defendant about the Accident, (*id.* 15–16); (4) the Insured's admission of non-cooperation should be independently fatal to the accusation of "gross

_____

[27]  Plaintiff Trustee's assertion that Defendant need to establish its "actions were . . . made in good faith" is incorrect.  (*See* Pl.'s Opp'n 1.)  The inquiry involves whether the Insurer acted in bad faith, and the strong presumption against such a finding requires Plaintiff Trustee to rebut that presumption with evidence that the "insurer's refusal to defend was based on 'more than an arguable difference of opinion' and exhibited 'a gross disregard for its policy obligations.'"  *Hugo Boss Fashions*, 252 F.3d at 624–25 (quoting *Sukup v. State*, 19 N.Y.2d 519, 522 (1967)).  Defendant need not establish its actions were taken "in good faith."  *See Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 362 (2d Cir. 2006) ("Under New York law, an insurer does not breach its duty of good faith when it makes a mistake in judgment or even when it behaves negligently."); *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 295 F.3d 232, 241 (2d Cir. 2002) ("Bad faith does not require a 'sinister motive.'" (quoting *Pavia v. State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445, 453 (1993))); *Pinto*, 221 F.3d at 399 ("No pat formula applies to the wide variety of fact patterns that occur, or readily resolves whether an insurer acted in good faith."); *Bronx Expert Radiology, P.C. v. Allstate Ins. Co.*, 831 N.Y.S.2d 346 (table) (Dist. Ct. 2006) ("[T]he insurer must do more than simply allege that it has a well founded belief.").

disregard," (*id.* at 19); and (5) Defendant "retained a private investigator to contact the [P]olicyholder to try to get her to cooperate on the grounds that the investigator should have also asked her to provide him with the [s]ummons and [c]omplaint," (Def.'s Opp'n 18; Def.'s Mem. 14). Defendant contends that the fact that the "[P]olicyholder had ample opportunity and encouragement to fulfill her contractual duty to promptly send the [s]ummons [and] [c]omplaint to [Defendant]," but Plaintiff Trustee fails to "explain why the [P]olicyholder continued to ignore [Defendant]'s requests for cooperation, or why her criminal counsel refused to honor his promise to send the pleadings to [Defendant]," further precludes a finding of bad faith. (Def.'s Opp'n 18–19.) In addition, Defendant argues that Plaintiff Trustee relies on the "uncorroborated testimony of the [P]olicyholder and then adds in spurious charges that [Defendant] orchestrated a 'cover up'" while "tr[ying] to explain away all evidence of [Defendant]'s repeated outreach to the [P]olicyholder as being supposedly 'manufactured.'" (Def.'s Opp'n 2; *see also* Def.'s Opp'n 21–23; Def.'s Reply 9; Def.'s Mem. 19–20.) Lastly, Defendant argues "the Policyholder's unsupported testimony that she faxed everything does not raise a material issue of fact" nor is it probative of bad faith, (Def.'s Mem. 16–19), and Plaintiff Trustee's expert should not be allowed to opine on Defendant's intent or motives, and the record otherwise includes no evidence that Defendant had "ill intent or a bad motive" to meet bad faith,[28] (*id.* at 19–20).

To recover consequential damages in excess of a policy's limit, courts in this Circuit have interpreted New York law to require a showing that an insurer committed their breach in bad faith. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624–25 (2d Cir. 2001) (finding an insurance company that was found to be in bad faith refusing to defend could be held

---

[28] The Court does not rely on the expert's testimony in its decision on the cross-motions for summary judgment and will address this argument further in *supra* Section II.C.

liable for damages arising from the underlying action in excess of the policy limit); *PAR Tech. Corp. v. Travelers Prop. Cas. Co. of Am.*, No. 22-CV-1121, 2024 WL 2747823, at *2 (N.D.N.Y. May 29, 2024) ("Upon a requisite showing of bad faith, New York law permits an insured party to recover consequential damages and 'extra-contractual' damages beyond the policy limit."); *1555 Jefferson Rd. LLC v. Travelers Prop. Cas. Co. of Am.*, 733 F. Supp. 3d 164, 170–71 (W.D.N.Y. 2024) ("[A]llegations of bad faith are relevant to [defendant's] request for . . . consequential damages. . . [which] requires a showing of bad faith to succeed."); *Laxminarayan Lodging, LLC v. First Specialty Ins. Co.*, No. 21-CV-7506, 2023 WL 3382867, at *5 (S.D.N.Y. May 11, 2023) (collecting cases where "the breach of a covenant of good faith and fair dealing can support a claim for consequential damages"); *Scottsdale Ins. Co. v. McGrath*, 549 F. Supp. 3d 334, 353 (S.D.N.Y. 2021) ("In a third-party context, the well-developed body of law regarding bad faith refusal to defend, settle, or indemnify provides guideposts to courts and contracting parties regarding when a party is entitled to damages in excess of policy limits . . . ."); *Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, No. 13-CV-2291, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014) ("[A]n insurer is not liable in excess of the policy limits for the breach of an insurance contract absent bad faith." (citation omitted)), *aff'd*, 581 F. App'x 49 (2d Cir. 2014); *Sunrise One, LLC v. Harleysville Ins. Co.*, 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) (quoting *Jane St.*, 2014 WL 28600, at *10) (same); *Harriprashad v. Metro. Prop. And Cas. Ins. Co.*, No. 09-CV-3105, 2011 WL 6337699, at *2 (E.D.N.Y. Nov. 17, 2011) ("Generally, an insured cannot recover additional damages from an insurer beyond the policy limits, but New York courts make an exception when there is a showing of bad faith."), *report and recommendation adopted*, 2011 WL 6370039 (E.D.N.Y. Dec. 19, 2011); *Goldmark, Inc.*, 2011 WL 743568, at *3 n.1 ("New York's highest court, and District Court cases considering the

59

issue, have held that bad faith is a necessary component of successful recovery of consequential damages." (citing *Bi*-Economy, 10 N.Y.3d at 192)); *In re AXIS Reinsurance Co. REFCO Related Ins. Litig.*, No. 07-CV-7924, 2010 WL 1375712, at *7 (S.D.N.Y. Mar. 7, 2010) ("Absent the requisite showing of bad faith, an insurer's monetary exposure is restricted to the policy limits."), *amended on other grounds by* 2010 WL 1375070 (S.D.N.Y. Mar. 19, 2010), *report and recommendation adopted sub nom. In re REFCO Sec. Litig.*, 2010 WL 1374891 (S.D.N.Y. Apr. 5, 2010).

Under New York law, there is a strong presumption against a finding of bad faith liability by an insurer and this presumption "can be rebutted only by evidence establishing that the insurer's refusal to defend was based on 'more than an arguable difference of opinion' and exhibited 'a gross disregard for its policy obligations.'" *Hugo Boss Fashions*, 252 F.3d at 25 (quoting *Sukup v. State*, 19 N.Y.2d 519, 522 (1967)); *see also Hastings Dev., LLC v. Evanston Ins. Co.*, 701 F. App'x 40, 44 (2d Cir. 2017) (quoting same); *Sunrise One, LLC*, 293 F. Supp. 3d at 328 ("A '[m]ere difference of opinion between an insurer and an insured over the availability of coverage' is insufficient." (alteration in original) (quoting *Jane St.*, 2014 WL 28600, at *10)); *Pavia v. State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445, 453–54 (1993) (affirming plaintiff must establish that the insurer's conduct constituted a "gross disregard" of the insured's interests).

Given the numerous issues of material facts disputed amongst the parties, both Plaintiff Trustee and Defendant have failed to adduce sufficient evidence to foreclose either possibility — that a jury could or could not find that Defendant breached its duty to defend in bad faith. Specifically, the following are disputed material facts of which a finding of bad faith hinges on: (1) when the Insured sent the summons and complaint to Defendant; (2) whether the Defendant engaged in a "cover up" "to conceal their own malfeasance and mishandling of the case" "when

60

it became apparent to decision makers . . . that the Umana [Lawsuit] was mishandled by claims adjusters and supervisors"; (3) whether Defendant's request to PM Legal Investigations and its subsequent investigation were sufficient; (4) whether the Insured adopted an "obstructionist attitude" and neglected to respond to Defendant's inquiries or otherwise respond to Defendant's outreach; (5) whether Defendant's May 25, 2017 and November 16, 2017 letters were "deceptive and misleading" and made "material representations" that Defendant was engaging counsel on behalf of the Insured in the Umana Lawsuit; and (6) whether Defendant should have been able to find the summons and complaint on E-Law earlier than 2019.  All of these issues impact the determination of whether Defendant breached its duty to defend in "gross disregard" of the Insured's interest, and thus neither side has cited to "sufficient evidence" for the Court to determine a jury could not find for the other side.

Defendant argues that the "Policyholder's unsupported testimony that she faxed everything does not raise a material issue of fact" because the testimony is both "irrelevant" and self-serving, "unsupported, incomplete, and illogical" is unpersuasive.  (Def.'s Mem. 16–19.)  In support, Defendant cites *Daus v. Lumbermen's Mutual Casualty Co.*, 659 N.Y.S.2d 584 (App. Div. 1997), contending that the case involved a similar situation and the court awarded summary judgment to the insurer on the issue of bad faith.  (Def.'s Mem. 17–19.)  However, Defendant fails to recognize key differences between *Daus* and this case.  In *Daus*: (1) the insured admitted "that he did not forward the summons and complaint in [the underlying] action to [the insurer], as the policy required, and did not inform [the insurer] of the pendency of the action until he was served with notice that [the injured plaintiff in the underlying action] was seeking a default judgment," 659 N.Y.S.2d at 666; (2) the insurer timely disclaimed its duty to defend based on its "apparently reasonable belief that the notice requirements of the policy had not been satisfied,"

*id.*; and (3) the court was not confronted with numerous disputed factual allegations of which the determination would impact a finding of bad faith, *id.*  In this case: (1) the Insured specifically argues that she forwarded the summons and complaint when she was first served, a fact Defendant disputes — Defendant's quoted language is in reference to the injured plaintiff in *Daus* maintaining that his attorney sent copies of the papers to the Insured, but this is irrelevant to the policyholder's lack of compliance with the policy notice requirements and its impact on a finding of the insurer's bad faith; (2) Defendant did not timely disclaim coverage and does not rely on its Disclaimer Letter; and (3) the Court finds, as noted above, that there are numerous factual disputes present between the parties.

Further, Defendant's argument that the Court should "weigh evidence" and "assess the credibility" of a witness, Shanta Haniff, directly contradicts Second Circuit case law which holds that "the court should not weigh evidence or assess the credibility of witnesses . . . [which] are within the sole province of the jury." *See, e.g., Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). Defendant asks the Court to apply a narrow exception to this rule as applied by the Second Circuit in *Rojas v. Roman Catholic Diocese of Rochester*, a case where the plaintiff "offered 'sham evidence' in opposition to the defendants' motion [] [for summary judgment]." 660 F.3d 98, 104–05 (2d Cir. 2011) (quoting *Hayes*, 84 F.3d at 619).  In *Rojas*, the Second Circuit affirmed the district court's grant of summary judgment finding that the plaintiff's opposition, which "relied almost entirely on her own testimony, in the form of an affidavit and excerpts from her depositions" and "directly contradicted [ ] her prior sworn statements and judicial admissions," was properly disregarded compared to the defendant's "competent and persuasive evidence" because it would "be impossible for a district court to determine whether the jury

62

could reasonably find for the plaintiff, . . . and thus whether there [were] any genuine issues of material fact, without making some assessment of the plaintiff's account." *Id.* at 105 (internal quotation marks and citations omitted). The court also found that "in certain cases[,] a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised *genuine* issues of material fact to be decided by a jury." *Id*. at 106. Holding that *Rojas* was "such a case," the Second Circuit found that the district court "did not err in concluding . . . that the evidence introduced by [the plaintiff] was not 'of such a character that it would warrant the jury in finding a verdict in favor of that party.'" *Id.* (quoting *Anderson*, 477 U.S. at 251). Unlike *Rojas*, the Insured's testimony is consistent with Plaintiff Trustee's briefings, and a jury could find it to be supported by the evidence. The Court cannot conclude that the Insured's testimony is not genuine, as Defendant attempts to argue. While it may be "self-serving," as Defendant alleges, (*see* Def.'s Mem. 15, 18), the question of when the Policyholder faxed the summons and complaint is a disputed issue of material fact which the jury must decide, in weighing all of the evidence and in assessing the credibility of the Insured's testimony. Therefore, the Court cannot grant Defendant's motion for summary judgment on the question of whether and when the Insured sent the summons and complaint to Defendant, nor on the issue of bad faith.

Thus, the Court finds that there exist triable issues of fact as to whether the Defendant acted in bad faith and denies both Plaintiff Trustee's motion for summary judgment and Defendant's cross-motion for summary judgment on this issue. *Harleysville Worcester Ins. Co. v. Consigli & Assocs., LLC*, No. 21-CV-934, 2025 WL 673327, at *14 (S.D.N.Y. Mar. 3, 2025) (finding the issue of bad faith remained "undetermined" and "involve[d] disputes of material fact" precluding summary judgment), *aff'd on recons.*, 2025 WL 2057782 (S.D.N.Y. July 23,

2025); *In re Savva's Rest., Inc.* No. 22-70382, 2023 WL 6167465, at *10 (Bankr. E.D.N.Y. Sep. 21, 2023) (denying summary judgment where genuine issues of material fact existed to determine bad faith holding "[b]ad faith claims generally raise fact issues preventing a determination of summary judgment" (internal citation omitted)); *Royal Ins. Co. of Am. v. Lexington Ins. Co.*, No. 02-CV-2085, 2004 WL 1620877, at *4 (S.D.N.Y. July 20, 2004) (denying summary judgment on bad faith claim because of genuine issues of material fact); *Fed. Ins. Co. v. N. Am. Specialty Ins. Co.*, 921 N.Y.S.2d 28, 30 (App. Div. 2011) (denying summary judgment where there remained "material issue of fact" as to whether the insurer breached their duty to defend in bad faith, as proven by acting in gross disregard, or whether they were merely negligent); *cf. Crysknife Cap. v. Liberty Specialty Mkts.*, No. 22-CV-7912, 2023 WL 3255777, at *18–20 (S.D.N.Y. May 3, 2023) (denying summary judgment where there existed other issues of material fact but the plaintiff still failed to demonstrate bad faith to prove it is entitled to relief above the policy limits); *State Farm Fire & Cas. Co. v. Ricci*, 947 N.Y.S.2d 265, 268 (App. Div. 2012) (finding the defendants "failed to raise a triable issue of fact sufficient to defeat the motion" for summary judgment on the issue of its "alleged bad faith and improper conduct" thus granting summary judgment to plaintiff).

### c. The Court strikes portions of Passin's expert report and precludes his testimony on various specific issues

Defendant moves to strike the entire report and proposed testimony[29] of Howard Passin, Plaintiff Trustee's expert who is prepared to opine on Defendant's claims-handling practices.[30] (Def.'s Strike Mem.; Def.'s Mem. 19–20.)  In support, Defendant argues that Passin's report and testimony should be stricken because: (1) his opinions go "far beyond what is permissible for an expert under *Daubert*" as he supplies "evidence of motive and intent" and opines "on the credibility of witnesses," which are "argumentative speculation," (Def.'s Strike Mem. 1); and (2)

---

[29]  As Plaintiff Trustee contends, (Pl.'s Strike Opp'n 16), and Defendant acknowledges, (Def.'s Strike Reply 2), Defendant's motion is styled as a motion to strike Passin's report and does not specifically ask the Court to strike his testimony.  Plaintiff Trustee argues Defendant's motion to strike should be denied on this basis alone.  (Pl.'s Strike Opp'n 16.)  However, all of the briefing involves arguments about whether to strike both Passin's report and ultimate testimony, as he cannot offer his opinions at trial without a valid report and can only testify at trial as to the subjects included in that report.  *See* Fed. R. Civ. P. 26(a)(2)(B); *Rhinehart v. CSX Transp., Inc.*, No. 10-CV-86A, 2015 WL 13719515, at *4 (W.D.N.Y. Nov. 18, 2015) (while defendant only requested "the court disregard the evidence" offered by plaintiff's expert that did "not comport with accepted criteria for expert opinions" and did not specifically move to strike the expert report, the court treated such request as a motion to strike the report and determined the admission of the expert's testimony on various issues), *report and recommendation adopted in part*, 2017 WL 3500018 (W.D.N.Y. Aug. 16, 2017); *Engineered Arresting Sys. Corp. v. M/V SAUDI HOFUF*, 46 F. Supp. 3d 302, 308 (S.D.N.Y. Sep. 5, 2014) (while the plaintiff only asked the court to disregard evidence submitted by an expert, and did not move to strike the declaration, the court ruled on the preclusion of the expert's declaration and anticipated testimony finding the "[c]ourt has an independent responsibility to serve as the gatekeeper for expert testimony" (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)); *see also Tomaselli v. Zimmer Inc.*, No. 14-CV-4474, 2017 WL 2820065, at *8 (S.D.N.Y. Jan. 20, 2017) ("The testimony of an expert witness is limited to the scope of his expert disclosure."); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08-CV-8426, 2012 WL 466785, at *9 (S.D.N.Y. Feb. 14, 2012) ("The expert's report operates to limit the scope of the testimony that can be elicited from the expert.").  For this reason, and as empowered to "serve as the gatekeeper for anticipated testimony," the Court's decision applies to both Passin's report and testimony.

[30]  The Court refers to the internal pagination of Howard Passin's expert report, curriculum vitae, and proposed testimony, which are all contained in Exhibit A of the Lepinskas Strike Decl.  (*See* Rep. of Howard Passin ("Passin Rep."), annexed to Lepinskas Strike Decl. as Ex. A, Docket Entry No. 116-1.; *see also* Dep. Transcript of Howard Passin ("Passin Dep. Tr."), annexed to Lepinskas Strike Decl. as Ex. B, Docket Entry No. 116-2.)

"he identifies no professional standards to assess the relevant standard of care" and instead his report "is a purely partisan narrative of his view of the evidence," (*id.*).[31]  Specifically, Defendant argues Passin's report is replete with "inadmissible opinions about [Defendant]'s "intent, motive, and state of mind, as well as inadmissible opinions about the credibility of witnesses, none of which "pass[] muster under *Daubert*."  (*Id.* at 7–9; Def.'s Strike Reply 1–2.) Defendant argues that the report is "a rant of accusations about 'gaslighting,' 'coverup,' false intent,' creating 'ruses,' and 'fabricating' evidence."  (Def.'s Strike Reply 1–2.)

Plaintiff Trustee disputes Defendant's arguments, and contends that: (1) Passin's qualifications and experience will assist the trier of fact to determine the factual issue of bad faith, (Pl.'s Strike Opp'n 3–6, 12–15); (2) Passin's "rhetorical flourishes" "are accurately descriptive of [D]efendant's conduct" and his "substantive opinions are focused on conduct — delays, alleged misrepresentations, and the insurer's mishandling of the claim — not [ ] Passin's assessment of [Defendant's] subjective motives," (*id.* at 7–11); and (3) Defendant's arguments about Passin's failure to establish a proper basis and anchor his opinions in a professional standard of care, non-citation to New York state statutes, and absence of published articles, "go to the weight of [ ] Passin's testimony, not its admissibility," (*id.* at 11–12).

For the reasons discussed below, the Court strikes Passin's expert report of any statements concerning Defendant's intent, motivation, or state of mind, a witness's credibility (through plausibility of their statements), and legal conclusions regarding whether Defendant

---

[31]  Defendant does not dispute Passin's qualifications to be designated as an expert or his qualifications to opine on claims handling.  (*See* Pl.'s Strike Opp'n 1, 3–5.)  For this reason, the Court does not address these requirements under Rule 702.

breached its duty to defend and/or acted in bad faith, and precludes him from testifying to any of these issues.[32]

### i.  Passin's opinions about Defendant's intent, motives, and state of mind

"[I]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *Fleming v. Village of Rockville Centre,* 801 F. Supp. 3d 113, 128 (E.D.N.Y. 2025) (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)); *see also In re Terrorist Attacks on Sep. 11, 2001*, No. 03-MD-1570, 2023 WL 3116763, at *15 (S.D.N.Y. Apr. 27, 2023) ("An expert cannot opine as to another's state of mind, but he may testify to the goals of an organization, provided he has sufficient basis." (first citing *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999); and then citing *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 123 (D. Conn. 2008)))); *Kewazinga Corp. v. Microsoft Corp.*, No. 18-CV-4500, 2021 WL 4066597, at *15 (S.D.N.Y. Sep. 1, 2021) ("Expert opinions about beliefs, intents, or motives are inadmissible."); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45

---

[32] Although Defendant moves to exclude Passin's report and proposed testimony in their entirety, the lack of admissibility of Passin's opinions as to Defendant's intent, motive, state of mind, credibility, and legal conclusions does not justify excluding all parts of his report and proposed testimony. "When faced with expert testimony that contains both reliable and unreliable opinions, district courts often exclude only the unreliable testimony." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) (collecting cases). "This process of parsing expert testimony is consistent with Rule 702's 'liberal admissibility standards,' which favor allowing the jury to hear testimony that 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (first quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); and then quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))). Passin's opinions as to Defendant's subjective mindset and intent "can easily be distinguished from testimony that could help the jury," *see id.*, such as his explanations of standard industry practices on handling claims and whether Defendant's processes deviated from such standards, as argued by Plaintiff Trustee. The Court therefore declines to "throw the good out with the bad" by excluding the entirety of Passin's opinion. *Id.* (citation omitted); *see Gade v. State Farm Mut. Auto. Ins. Co.*, No. 14-CV-48, 2015 WL 7306433, at *13–14 (D. Vt. Nov. 19, 2015) (finding expert could opine as to whether the insurer violated industry standards but could not opine on the insurer's state of mind or intent when it was evaluating the insured's claims, nor could he opine as to a legal conclusion about the insurer's conduct breaching its duty to defend and indemnify).

(S.D.N.Y. 2016) (noting that "experts may not offer opinions regarding the intent or motive of parties as part of their analysis"); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts . . . ."). "Experts may, however, offer testimony discussing 'ordinary practices and usages' in a particular industry." *Scott*, 315 F.R.D. at 46 (citing *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005)); *see Liberty Mut. Ins. Co. v. Day to Day Imps.*, No. 22-CV-2181, 2025 WL 2117897, at *20 (S.D.N.Y. July 29, 2025) ("'Experts may . . . offer testimony discussing ordinary practices and usages in a particular industry,' especially where 'the expert has educational and experiential qualifications in a general field closely related to the subject matter in question.'" (alteration in original) (internal citations omitted) (first quoting *Scott*, 315 F.R.D. at 46; then quoting *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 538–39 (S.D.N.Y. 2024))); *see also In re Blech Secs. Litig.*, No. 94-CV-7696, 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003) (stating that "it is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards" (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y.), *amended on recons. in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011))).

Plaintiff Trustee persuasively argues that Passin's opinions are relevant and "will assist the trier of fact in determining the central questions of whether [Defendant]'s conduct deviated from industry norms . . . and whether [Defendant] mishandled the claim and acted in bad faith of the [Insured]." (Pl.'s Strike Opp'n 1.) Given Passin's "specific document review detailed in his report, the claims file, deposition testimony, claims industry standards, and his professional

68

expertise" developed over "decades of experience in insurance claims handling and claims management," his testimony will assist the jury with understanding and examining complex insurance practices as outlined in Plaintiff Trustee's opposition brief.  (*Id.* at 3–6, 12–15.)

However, Passin must do exactly that, "assist the trier of fact," not opine to the trier of fact what Defendant's intent or motive was — this is something the jury must do itself to determine bad faith.  *See Abbott Lab'ys v. Adelphia Supply, USA.*, No. 15-CV-5826, 17-CV-6002, 2019 WL 5696148, at *47 (E.D.N.Y. Sep. 30, 2019) ("In assessing whether an expert report will assist the trier of fact, the Second Circuit has 'consistently held . . . that expert testimony that usurp[s]  . . . the role of the jury in applying the law to the facts before it by definition does not aid the jury in making a decision; rather it undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's.'" (quoting *Nimely*, 414 F.3d at 397 (internal quotation marks omitted))).  Specifically, Passin's statements that Defendant "gaslighted" the Insureds, "fabricated" and/or "manufactured" evidence, had tortious and "false" intent, and "knew" or "had knowledge" of the Umana Lawsuit, are inadmissible opinions attempting to explain why Defendant took certain actions.[33]  These

---

[33]  A few examples of these impermissible statements include: "GEICO *essentially gaslighted* the Haniff's *by deliberately distorting the reality* about what happened *by covering up the truth* of its own bad conduct," (Passin Rep. 6 (emphasis added)); "Ms. Mather *entered a note in the file to support her conjured up excuse* stating that there was no cooperation from the insured," (*id.* at 8 (emphasis added)); "Instead, *GEICO went on the offensive, conjured up excuses* not to defend the Haniff's by creating false facts to support their bad faith conduct," (*id.* (emphasis added)); "GEICO created a false narrative," (*id.* (emphasis added)); "*GEICO had more than enough information* when it learned about the default *to stop playing the blame game . . .*," (*id.* (emphasis added)); "GEICO *fabricated reasons to deny coverage* to the Haniffs," (*id.* at 9 (emphasis added)); "*In furtherance of GEICO looking to create excuses* to disclaim coverage and deny a defense to the Haniffs . . .," (*id.* at 12 (emphasis added)); "GEICO *concocted* this red herring 'defense' *to coverup* its bad faith breach of contract," (*id.* at 14 (emphasis added)); "Ms. Fishman's report *was crafted* to make it appear that GEICO acted correctly," (*id.* at 15 (emphasis added)); "GEICO's *decision to abandon* the Haniff's . . .," (*id.* at 12 (emphasis added)); "*It was*

statements are not just "rhetoric flourishes" as Plaintiff Trustee argues, but speculation on Defendant's motives, intent, and state of mind, which are inadmissible as speculative opinions unhelpful to the trier of fact. (Pl.'s Strike Opp'n 7.) *See Day to Day Imps.*, 2025 WL 2117897, at *20 (striking from report and excluding expert's commentaries on the "motives" of the insurer's fact witnesses during its investigation of the insureds' claims); *Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12-CV-3040, 2014 WL 464769, at *5 (S.D.N.Y. Jan. 28, 2014) (finding expert could not testify about what parties "must have known" or "could reasonably have anticipated," as such opinions are "not based on science but on conjecture"); *Highland Cap. Mgmt., L.P.*, 551 F. Supp. 2d at 187–88 (expert could not "state assumptions or make inferences regarding the knowledge and intent of [defendant's] employees"). Passin can testify and opine on facts, comparing, for example, standard industry practices to Defendant's actions, but he may not conclude, for example, that Defendant took certain actions to engage in a "cover-up" and to "gaslight" the Insured. Regardless of whether such inferences can reasonably be drawn, it is the province of the jury to draw such inferences from the evidence presented, and Passin may not use his expertise to offer such characterizations of Defendant's motivations or reactions unless he is citing a source that states these motivations or reactions. *See United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993) (stating that the "plain language" of Federal Rule of Evidence 704(b) "means that the expert cannot expressly 'state the inference,' but must leave the inference, however obvious, for the jury to draw" (quoting *United States v. Alvarez*, 837 F.2d

---

*GEICO's intent* to shift the blame on the Haniffs . . .," (Passin Dep. Tr. 15:12–13 (emphasis added)); identifying employees who "*had the intent* to gaslight the Haniffs by deliberately distorting reality," (*id.* at 15:20–23 (emphasis added)); "GEICO *had knowledge* of what really happened but tried to create a different story," (*id.* at 17:17–20 (emphasis added)); and stating Defendant "lied to the Haniffs," (*id.* at 21:10–12).

70

1024, 1031 (11th Cir. 1988))).  The Court accordingly strikes Passin's report of such statements and further precludes any of his anticipated testimony on these issues.

### ii.    Other objections

Defendant argues that the Court should strike Passin's opinions on the credibility of another witness's testimony.  (Def.'s Strike Mem. 7.)  Specifically, Defendant cites to Passin's deposition transcript where he states, "I assessed [Shanta Haniff's credibility] on my belief that when people are sworn . . . ."  (Passin Dep. Tr. 43:7-10.)  Plaintiff Trustee states that "[w]hile experts may not 'usurp the jury's role' in assessing witness credibility, an insurance/bad faith expert is entitled to testify about whether claims decisions are consistent with industry standards, even if doing so evaluates the plausibility of explanations offered by fact witnesses" but fails to cite any case law or legal authority to support this conclusion.  (Pl.'s Strike Opp'n 6–7.)  However, Plaintiff Trustee acknowledges Defendant's concern that Passin opines on the credibility of witnesses, (*id.* at 7 ("If the court is concerned about certain credibility references, it may strike or limit testimony on that narrow basis.")).

Evaluating the plausibility of explanations offered by a witness is inherently a comment on the witness's credibility, an issue which is "exclusively for the determination of the jury." *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.) (citing *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987)), *on reh'g*, 856 F.2d 5 (2d. Cir. 1988); *see Nimely*, 414 F.3d at 398 (finding an expert's testimony where he stated that he believed the witnesses were not only lying, but also gave the jury a series of rationales for that belief should have been precluded because he "commented directly, under the guise of an expert opinion, on the credibility of [ ] testimony from crucial fact witnesses").  Thus, the Court strikes the Passin report of, and precludes Passin from testifying about, his opinions about the plausibility of statements made by other witnesses, such as Defendant's employees.  Passin may opine whether Defendant's employees' statements

71

are inconsistent with other facts or with industry standard practices without calling into question the credibility of those witnesses. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 15053250, at *46 (E.D.N.Y. Oct. 26, 2022) (declining to preclude testimony where the expert disagrees with the witness's testimony or believes that position is contradicted by other evidence without commenting directly on the witness's credibility). To the extent Defendant disputes other statements made about intent and motive that impact witness credibility, the Court has already disposed of those statements above.

As to Defendant's other argument to strike — that Passin fails to establish his opinions are based on a professional standard of care, (Def.'s Strike Mem. 9–10) — Plaintiff Trustee correctly argues this objection goes to the weight of Passin's admissible opinions (specifically those not opining on Defendant's intent, motive, or state of mind). *See Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) ("By contrast, 'other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996))).

Lastly, although the parties do not address whether Passin's report and proposed testimony contains impermissible legal conclusions in their briefing papers, (*see generally* Def.'s Strike Mem.; Pl.'s Strike Opp'n; Def.'s Strike Reply), the Court finds Passin's report replete with his opinions expressing legal conclusions — for example, Passin finds "GEICO *breached* and ignored its responsibilities under the contract and *acted in bad faith* by refusing to defend the [Insured]." (Passin Rep. 9 (emphasis added); *see id.* 5, 7, 8, 9, 12, 13, 14, 15, 19.) Regardless of underlying expertise, "experts may not testify as to conclusions of law[,]" because "[d]oing so would usurp the role of the court in determining the applicable legal standards." *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (first citing *United States v. Bilzerian*, 926

72

F.2d 1285, 1294 (2d Cir. 1991); and then citing *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)); *see Bilzerian*, 926 F.2d at 1294 ("As a general rule an expert's testimony on issues of law is inadmissible." (citation omitted)); *In re ACTOS Antitrust Litig.*, 783 F. Supp. 3d 749, 796 (S.D.N.Y. 2025) (quoting *Bilzerian*, 926 F.2d at 1294) (same); *see also Nimely*, 414 F.3d at 397 (explaining that the Second Circuit has "consistently held . . . that expert testimony that 'usurp[s] the role of the trial judge in instructing the jury as to the applicable law . . . by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach.'" (first quoting *Bilzerian*, 926 F.2d at 1294; and then quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994))); *Wells Fargo Bank v. U.S. Life Ins. Co. in the City of New York*, No. 22-CV-8606, 2025 WL 2220948, at *23 (S.D.N.Y. Aug. 4, 2025) ("[E]xpert testimony may not usurp the province of the judge to instruct on the law . . . ."). Accordingly, the Court strikes Passin's report of such statements and precludes Passin from testifying as to legal conclusions, such as those involving a breach of the duty to defend and bad faith. *See Gade v. State Farm Mut. Auto. Ins. Co.*, No. 15-CV-48, 2015 WL 7306433, at *14 (D. Vt. Nov. 19, 2015) (finding an insurance expert's opinions on whether defendant's conduct rise to the level of bad faith were legal conclusions that "invade[d] the court's province by testifying on a question of law" and thus were inadmissible).

In accordance with the above, Passin must refrain from testifying, without direct factual support, to any of Defendant's intentions, motivations, or state of mind, to any witness's credibility (through plausibility of their statements), and to the legal conclusions of whether Defendant breached its duty to defend or acted in bad faith. Where Passin relies on a source that states as a fact Defendant's intent, motivation, or state of mind, or a source that clearly demonstrates knowledge of some fact on the part of the Defendant, he may "referenc[e] this fact

. . . as the *basis* for [his] ultimate opinion." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15044626, at \*31 (quoting *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-CV-686, 2011 WL 6288415, at \*8 (S.D.N.Y. Dec. 15, 2011)). If, at trial, Defendant disagrees that Passin's statement falls within these permissible bounds, it may challenge his testimony at that time.

### d. The Court grants Plaintiff Trustee's request to deem the Jury Demand filed *nunc pro tunc* and denies Defendant's motion to strike the Jury Demand

Both parties appear to agree that Plaintiff Trustee's Jury Demand was untimely filed, and Plaintiff Trustee improperly filed the demand with the Court instead of seeking leave to file an untimely demand for a jury trial.[34] (*See* Pl.'s Jury Demand Mem. 1–2, 5; Def.'s Jury Demand Reply 2–3.) Plaintiff Trustee now requests that the Court either deem the Jury Demand filed *nunc pro tunc* or grant leave to file a Jury Demand. (*See generally* Pl.'s Jury Demand Mem.; Pl.'s Jury Demand Reply.) Plaintiff Trustee argues that its Jury Demand should not be stricken because: (1) Rule 39(b) grants the court discretion to order a jury trial in the interests of justice, (Pl.'s Jury Demand Reply 1); (2) the Court is not constrained to Rule 38(b) and should instead find flexibility under Rule 6(b)(1), (*id*. at 1–2, 3–4; Pl.'s Jury Demand Mem. 5–9); and (3) the four factors enumerated in *Pioneer*, 507 U.S. 380 (1993), weigh in favor of finding "excusable neglect" under Rule 6(b)(1) since (a) there is no danger of prejudice to the Defendant because all discovery and conferences occurred with knowledge of the untimely filed Jury Demand, filed on September 14, 2023, (b) the length and impact of the delay was minimal because the demand

---

[34] While Rule 38 of the Federal Rules of Civil Procedure requires Plaintiff Trustee to have served Defendant with a written jury demand "no later than 14 days after the last pleading directed to the issue is served," it is unclear whether or not that deadline is impacted by the subsequent Motion to Withdraw Bankruptcy Reference to Bankruptcy Court. Regardless, the parties concede that Plaintiff Trustee's jury demand was untimely filed and therefore the Court need not decide this issue.

was filed before any discovery commenced, (c) the reason for the delay relates to the case's origins in Bankruptcy Court where a jury trial was unavailable and the demand was promptly filed post-transfer, and (d) Plaintiff Trustee "consistently acted in reliance on the correct procedural forum, not to gain tactical advantage," thus acting in good faith, (Pl.'s Jury Demand Mem. 7–9; Pl.'s Jury Demand Reply 2). Specifically, Plaintiff Trustee states the procedural choice not to demand a jury trial earlier was "based on the anticipated advantages of the bankruptcy forum, a context that materially changed when the reference was withdraw to district court." (Pl.'s Jury Demand Reply 3.) Thus, the delayed demand "reflect[ed] a legitimate shift in circumstances," "directly ar[ising] from the transfer to district court," which came "swiftly after the reference was withdraw." (*Id*. at 2.)

Defendant argues that the Court should strike Plaintiff Trustee's jury demand because: (1) Plaintiff Trustee's previously filed Jury Demand was untimely, and thus Plaintiff Trustee waived his right to a jury, (Def.'s Jury Demand Mem. 2–3); and (2) Plaintiff Trustee cannot invoke Rule 39(b) to avoid waiver because his failure to do so timely was "mere inadvertence," (*id.* at 3–4; Def.'s Jury Demand Reply Mem. 3–6). In addition, Defendant contends the Court should deny Plaintiff Trustee's cross-motion for leave to file a jury demand under Rule 6(b) because "[Plaintiff Trustee] cannot demonstrate excusable neglect" as "his decision not to file a jury demand was tactical, and a tactical decision is necessarily not excusable neglect" and "the key factor in the Rule 6(b) analysis — [the reason for the delay] — leans heavily against a finding of excusable neglect."[35] (*Id.* at 6–10.)

---

[35] Defendant also attempts to argue that the "law of the case" in the Court's Bankruptcy Reference Withdrawal Decision, states that the "Court determined that there would be no jury trial in this case." (Def.'s Jury Demand Mem. 5; Def.'s Jury Demand Reply Mem. 10–11.) Defendant mischaracterizes and misquotes the Court's decision. In analyzing one factor to

### i.   The impact of the procedural posture

At the outset, the Court will consider Plaintiff Trustee's current motion for leave to file a jury demand *nunc pro tunc*, which Plaintiff Trustee should have originally submitted instead of improperly filing the Jury Demand in September of 2023.  Courts typically grant such requests for leave *nunc pro tunc* in various contexts, such as amending pleadings, filing expert materials, or filing late motions, when a party files a motion without proper leave to file, including where an untimely request for a jury trial was made.  *See, e.g.*, *Baker v. Amtrak Corp.*, 163 F.R.D 219 (S.D.N.Y. 1995) (granting plaintiff's motion to file a jury demand *nunc pro tunc*).

Defendant has known about Plaintiff Trustee's untimely Jury Demand since it was made on September 14, 2023.  (*See* Jury Demand.)  In fact, Defendant made its objections known to Plaintiff Trustee several months after the filing on March 11, 2024, by sending a letter to counsel, requesting Plaintiff Trustee withdraw the Jury Demand.  (Letter dated Mar. 11, 2024, annexed to "Lepinskas Jury Demand Decl." as Ex. C, Docket Entry No. 126-3.)  Despite Plaintiff Trustee's response on that same day refusing to withdraw the demand, (*see id.*), Defendant waited over nineteen months, until October 17, 2025, after the close of discovery, to file its motion to strike the Jury Demand.  While Plaintiff Trustee should have moved for leave to file its Jury Demand back in 2023 following the withdrawal of the bankruptcy reference, but instead filed its delinquent Jury Demand, Defendant waited over two years to file its objection.  The Court will therefore assess the motions as it would have originally done had Plaintiff Trustee correctly filed a motion for leave to file an untimely Jury Demand and/or Defendant moved to

---

determine whether the issues were "core" or "non-core," the Court noted the parties, while having a right to a jury trial, "have not made a jury demand in this matter" and "the Court could find the case was unlikely to reach trial." (Bankruptcy Reference Withdrawal Decision 13.) Nowhere in the opinion does the Court state or insinuate that it "determined that there would be no jury trial," contrary to Defendant's contentions. This argument mischaracterizes the Court's opinion and thus the Court rejects Defendant's argument.

76

strike the Jury Demand when it was filed.  Defendant cannot strategically delay objecting in order to attempt to claim prejudice — this decision imposes no additional prejudice as Defendant has been on notice of the Jury Demand since September of 2023.  *See Raymond*, 148 F.3d at 66–67 (holding the district court acted "well within its discretion" under *Pioneer* in excusing a later jury demand when there was no bad faith or prejudice to any party); *Encarnacion*, 2014 WL 4494160, at *5 (granting plaintiff's belated jury demand where the defendants objected that plaintiff never moved for leave to file an untimely jury demand but where defendants were "not without fault" as "they waited over two months after the plaintiff submitted her jury demand to file the instant motion," as "guided by the recognition that the right to a jury trial is fundamental and that striking it [ ] would penalize a plaintiff for the procedural errors of counsel" and because the "failure ha[d] caused the defendant no prejudice").

This case presents a unique procedural posture and thus warrants a closer inspection. Typically, courts in the Second Circuit look at whether the late jury demand is due to mere inadvertence, under Rule 39(b), *Noonan*, 375 F.2d 69, and/or whether the failure was one of "excusable neglect," under Rule 6(b), *Raymond*, 148 F.3d 63 and *Pioneer*, 507 U.S. 380.  *See, e.g., Lateral Recovery LLC*, 2024 WL 5077628, at *2–6 (deciding the motion for a jury trial by first analyzing Rule 39(b), then Rule 6(b)); *Gencarelli v. Toto USA Inc.*, No. 23-CV-8438, 2024 WL 3273277, at *2 (S.D.N.Y. July 2, 2024) (same).  Here, however, Plaintiff Trustee's failure to file a late Jury Demand is not one of "mere inadvertence" or "neglect" — but it is due to the realities of forum transfer.  (*See* Pl.'s Jury Demand Mem. 2–5 ("Plaintiff [Trustee] did not seek a jury trial in *Bankruptcy Court*.").)  In a bankruptcy proceeding, Rules 38 and 39 of the Federal Rules of Civil Procedure apply (insofar as they apply to jury trials) although there are specific requirements that need to be established before a jury demand is adopted.  *See* Fed. R. Bankr. P.

77

9015. To request a jury trial in bankruptcy court, "[t]he parties may — jointly or separately — file a statement consenting to a jury trial conducted by a bankruptcy judge under 28 U.S.C. § 157(e) if: (1) the right to a jury trial applies; (2) a timely demand has been filed under Rule 38(b); (3) the bankruptcy judge has been specially designated to conduct the jury trial; and (4) the statement is filed within any time specified by local rule." *Id.* In addition, under 28 U.S.C. § 157(e), "[i]f the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." *Id.* The reason for these additional requirements is, as the Supreme Court has stated, because "a bankruptcy court . . . [is] a specialized court of equity . . . a forum before which a jury would be out of place and would go far to dismantle the statutory scheme." *Atlas Roofing Co., Inc. v. Occupational Safety and Health Rev. Comm'r*, 430 U.S. 442, 454 n.11 (1977); *see Curtis v. Loether*, 415 U.S. 189, 195 (1974) ("[T]he [c]ourt recognized that a bankruptcy court has been traditionally viewed as a court of equity and that jury trials would disremember the statutory scheme of the Bankruptcy Act." (internal quotation marks and citations omitted)). Plaintiff Trustee only filed his Jury Demand after the case was withdrawn from Bankruptcy Court to this Court, a court of law which regularly handles jury trials.

Neither party cites to case law where a case was withdrawn from bankruptcy court, transferred to a district court and a late jury demand was filed, and their arguments regarding "inadvertence" and "excusable neglect" are inapplicable since neither are the reason for the late Jury Demand in this case. The Court notes that removal from state court to federal court, especially in New York, is analogous to the removal from bankruptcy court to a district court. New York federal courts have developed an entire body of law in situations where no demand

78

was made in state court, as New York does not automatically grant jury trials, and a jury demand was filed after the case was removed to federal court. *See Cascone v. Ortho Pharm. Corp.*, 702 F.2d 389, 391–93 (2d Cir. 1983) (establishing that the Federal Rules of Civil Procedure do not address situations where the case was removed before a jury trial demand was filed in New York state court and approving of the district judge's analysis and applications of the factors discussed in *Higgins* (the "*Higgins* Factors"[36]) to determine whether to exercise discretion under Rule 39(b)); *Bolmeier*, 2025 WL 2779286, at *2–4 (adopting *Cascone*'s holdings and applying *Higgins* Factors, finding plaintiff "did not deliberately waive his right to a jury trial . . . on balance [of] the relevant factors [weighing] in favor of granting a jury trial even though the request may be untimely"); *Janetos v. Home Depot U.S.A., Inc.*, No. 09-CV-1025, 2012 WL 4364510, at *2–4, *7 (E.D.N.Y. Sep. 25, 2012) (same).

New York Civil Practice Laws and Rules only require a party to file a jury request in state court with a "note of issue" but does not specify when such notice needs to be filed. *See* N.Y. C.P.L.R. § 4102(a); *Cascone*, 702 F.2d at 391 ("The New York Statute requires that the request for a jury in the state courts be made by filing it with a 'note of issue' . . . [and] [n]o time for the notice is specified."); *Rupolo*, 749 F. Supp. 2d at 49 ("New York law does not require a party to demand a jury trial until very late in the proceedings . . . [s]ince the filing of a note of issue is the thing that gets the case onto the court's calendar to await trial." (internal citations and quotation marks omitted)). Thus, New York federal courts frequently encounter the exact situation present in this case — where a jury demand was only filed in the case after it was removed to federal court. The Second Circuit has held that "[a]lthough we may not overlook lack of compliance with the federal procedural rules in removed cases, there is nonetheless some

---

[36] The *Higgins* Factors discussed further *infra* Section 2.B.d.ii.

'play in the joints' for accommodating a removed party who may not be as at ease in the new surroundings imposed upon him," thus "the argument for applying the rigid *Noonan* constraints on the district court's discretion is simply not as strong." *Cascone*, 702 F.2d at 392.  This line of cases originated with *Higgins*, 526 F.2d 1004, where the plaintiff originally filed in state court "but was taken to a different jurisdiction, perhaps against his will, but, in any event, to a forum not of his choosing." *Cascone*, 702 F.2d at 392 (citing *Higgins*, 526 F.2d 1004).  *Higgins*, as approved in *Cascone*, established that in these situations, a court should apply a three-part test, considering: (1) whether the case is of a type ordinarily tried by a jury; (2) whether the parties have been operating under the assumption that there would be a bench trial; and (3) whether the nonmoving party consents to the demand and, if not, whether that party would be unduly prejudiced if the court were to grant a jury trial.  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 928 F. Supp. 394, 397 (S.D.N.Y. 1996) (citing *Higgins*, 526, F.2d at 1007); *see also Encarnacion*, 2014 WL 4494160, at *2–3 (citing same); *Harriprashad*, 2011 WL 6337699, at *4 (E.D.N.Y. Nov. 17, 2011) (citing same); *Perelman ex rel. Perelman v. Camp Androscoggin Jr.-Sr., Inc.*, No. 06-CV-13020, 2008 WL 199475, at *3 (S.D.N.Y. Jan. 22, 2008) (citing same); *Ajnoha v. JC Penney Life Ins. Co.*, 480 F. Supp. 2d 663, 677 (E.D.N.Y. 2007) (citing same).  "The Second Circuit has recognized that cases that have been removed to the federal court . . . fall within a well-recognized 'gray area'[,]" and thus "courts must look to the general rules governing jury demands in federal courts, Rules 38 and 39" and  "approach each application under Rule 39(b) with an open mind and an eye to the actual situation in that particular case, rather than with a fixed policy against granting the application or even a preconceived notion that applications of this kind are usually to be denied." *Bolmeier*, 2025 WL 2779286, at *3 (internal quotation marks and citations omitted)).

80

Since the case before the Court involves a similarly situated plaintiff, Plaintiff Trustee, taken to this Court against his wishes (as outlined in Def.'s Jury Demand Mem.), and "[i]t is well established that the right to a jury trial is a fundamental right and that purported waivers are to be 'scrutinized with the utmost care," *S.E.C. v. Masri*, 551 F. Supp. 2d 320, 321 (S.D.N.Y. 2008) (quoting *Heyman v. Kline*, 456 F.2d 123, 129 (2d Cir. 1972)), the Court will employ such analysis in favor of equity.  *See Barnes v. Alves*, No. 01-CV-6559, 2014 WL 2435807, at *3 (S.D.N.Y. May 30, 2014) ("Even where a party fails to make a proper jury demand, the court may use its discretion to overcome the waiver and order a jury trial."); *see also Gargiulo v. Delsole*, 769 F.2d 77, 79 (2d Cir. 1985) ("[W]aiver is not lightly to be inferred.").

### ii.    *Higgins* Factors under Rule 39(b)

Plaintiff Trustee argues that it meets all three of the *Higgins* Factors: (1) "[t]he issues are traditionally triable by jury"; (2) the Jury Demand was filed over two years ago on September 14, 2023, which Defendant has known about and even objected to it in a letter dated March 11, 2024 but did not move to strike until October 17, 2025; and (3) "[Defendant] faces no prejudice because [Defendant's] own silence and completion of discovery for nearly two years after the Jury Demand was filed, without objection at conferences or in communications, confirms absence of prejudice" and "both parties prepared and litigated this matter with a jury trial in mind, as evidenced by [Defendant's] own silence and participation in discovery under the jury demand."  (Pl.'s Jury Demand Mem. 5, 8.)  Plaintiff Trustee also argues that "[t]he parties' conduct is explained by the transfer/unique procedural posture" and "[b]oth sides' conduct — especially Plaintiff [Trustee]'s —was shaped by the limits of bankruptcy procedure."  *Id.*

Defendant does not specifically respond to these factors but argues under Rule 6(b) — the "excusable neglect" factors involve the issues of prejudice and the parties' expectations overlap with the *Higgins* Factors.  (Def.'s Jury Demand Reply 6, 8–10.)  Specifically, Defendant

81

contends that, in reliance on the papers submitted in the Adversary Proceeding and in connection with the Motion to Withdraw Bankruptcy Reference, "the parties and the Court assumed there would not be a jury trial." (*Id.* at 5.) Defendant's briefs include no explicit argument on prejudice.

First, this case and the issues presented are typically tried by a jury. *See Gov't Emps. Ins. Co. v. Saco*, No. 12-CV-5633, 15-CV-634, 2020 WL 3414531, at *3 (E.D.N.Y. June 22, 2020) ("bad faith claims are traditionally tried by a jury"); *Nat'l Union Fire Ins. Co.*, 928 F. Supp. at 397–98 (finding the first factor weighing in favor of granting the jury demand where the plaintiff's "claims involve fact-intensive questions regarding the construction and interpretation of an insurance policy, as well as the intent and understanding of various parties" and the plaintiff sought "a judgment for reimbursement, money damages, and sanctions").

Second, the Court finds that the parties have been operating under an assumption that there would be a jury trial because Plaintiff Trustee filed his Jury Demand in September of 2023, less than three months after the Court decided to withdraw the reference to the Bankruptcy Court. (*See* Jury Demand; Bankruptcy Reference Withdrawal Decision.) Despite Defendant's contention that "the parties . . . assumed there would *not* be a jury trial" based on briefing in the Adversary Proceeding and the briefing for the Motion to Withdraw Bankruptcy Reference, Defendant had within its control the ability to determine this issue once the case was withdrawn from the Bankruptcy Court and the Jury Demand filed. Defendant should have moved to strike the Jury Demand much earlier, if it wished to know whether the Jury Demand would be accepted by the Court, rather than to wait over two years after the Jury Demand was filed and over twenty-seven months after the removal from Bankruptcy Court. *See Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314 (S.D.N.Y. 2021) (finding it was "reluctant to deprive [the p]laintiff of the

82

opportunity to try this case before a jury given that their desire to do so has been evident throughout — even if it was not presented in the proper procedural manner"), *vacated on other grounds,* 2024 WL 2813563 (2d Cir. June 3, 2024); *Nat'l Union Fire Ins. Co.*, 928 F. Supp. at 398 (second factor supported granting demand where "there [was] ample evidence that the parties have been acting under the assumption of a jury trial in this case").

Lastly, Defendant would not be unduly prejudiced if the Court were to grant a jury trial — in fact, Defendant did not attempt to argue that it would be. *See Gov't Emps. Ins. Co.*, 2020 WL 341453, at *3 ("A party claiming prejudice must detail with specificity how it will suffer as a result of the late demand."); *Janetos*, 2012 WL 4364510, at *5 (requiring "a party claiming prejudice to make a specific demonstration of prejudice"). While "'[p]rejudice to the adverse party is the most important or significant' factor . . . [t]he relevant 'inquiry is not whether [the defendant] will be prejudiced by a jury trial, but whether [the defendant] will suffer prejudice as a result of the *late demand* for a jury trial.'" *Gov't Emps. Ins. Co.*, 2020 WL 341453, at *3 (first quoting *Rupolo*, 749 F. Supp. 2d at 47; then quoting *Janetos*, 2012 WL 4364510, at *4); *see Nat'l Union Fire Ins. Co.*, 928 F. Supp. at 398 ("Prejudice must arise from the untimeliness of the demand, not simply from the possibility of a jury trial."). The Jury Demand was filed in September of 2023, just mere months after the case was withdrawn from Bankruptcy Court. Defendant complained about the Jury Demand's late filing in a letter sent to Plaintiff Trustee's counsel dated March 11, 2024, over five months after Plaintiff Trustee filed the Jury Demand, to which counsel declined to withdraw the demand that same day. Defendant has known about the Jury Demand since then, conducting and completing discovery with this knowledge. *See Perelman ex rel. Perelman*, 2008 WL 199475, at *4 ("Where, as here, a party fails to provide 'any substantiation of how it had done anything differently or how it will be prejudiced,' a court

83

may properly grant leave to make an untimely demand." (quoting *Unger v. Cunard Line, Inc.*, 100 F.R.D. 472, 473–74 (S.D.N.Y. 1984)); *Nat'l Union Fire Ins. Co.*, 928 F. Supp. at 398 (finding no prejudice where "there [was] substantial evidence that all parties have proceeded under the belief that the case would be tried before a jury, and [defendant] ha[d] failed to indicate specific instances or circumstances that have influenced its preparation for trial in any way"). Thus, imposing a jury requirement would not change or even impact Defendant's position ahead of trial.  Defendant cannot now argue it would be prejudiced given its decision to wait over two years after the Jury Demand's filing before moving to strike — this wait can only be seen as strategic to tip the scales in deciding this motion in Defendant's favor.

As the *Higgins* Factors weigh in favor of allowing a jury trial in this case, the Court exercises its discretion under Rule 39(b) to excuse the untimely Jury Demand, and grants plaintiff's request to deem the Jury Demand filed *nunc pro tunc*.[37]  The Court denies Defendant's motion to strike the Jury Demand.

## III.  Conclusion

For the foregoing reasons, the Court: (1) grants Plaintiff Trustee's motion for summary judgment in part, and denies in part; (2) denies Defendant's motion for summary judgment; (3) grants Defendant's motion to strike Howard Passin's report in part, striking the respective portions of the report and precluding testimony on the issues relating to Defendant's intent, motivation, or state of mind, to any witness's credibility (through plausibility of their

---

[37]  Because the Court exercises its discretion under Rule 39(b), it declines to conduct an analysis pursuant to Rule 6(b).  *See, e.g. Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 46–50 (E.D.N.Y. 2010) (granting motion for trial by jury, excusing untimely jury demand under Rule 39(b) and not conducting analysis under Rule 6(b)); *cf. Lateral Recovery LLC v. Funderz.Net., LLC*, No. 22-CV-2170, 2024 WL 5077628, at *3 (S.D.N.Y. Dec. 11, 2024) (proceeding with conducting analysis under Rule 6(b) after finding the motion for an untimely jury demand could not be granted under Rule 39(b)).

statements), and to the legal conclusions of whether Defendant breached its duty to defend or acted in bad faith, and denies in part the portions of report that complies with the law and can be helpful to the jury; (4) grants Plaintiff Trustee's motion to deem the Jury Demand filed *nunc pro tunc*; and (5) denies Defendant's motion to strike the Jury Demand.

Dated:  March 2, 2026
       Brooklyn, New York

SO ORDERED:

    /s/MKB
MARGO K. BRODIE
United States District Judge
